[Civil No. 1943. Filed May 2, 1922.]

[206 Pac. 580.]

OTHO MORRIS, Appellant, v. WESTERN UNION TELEGRAPH COMPANY, a Corporation, Appellee.

1. TELEGRAPHS AND TELEPHONES — LIMITATION OF LIABILITY FOR MISTAKES, OR NONDELIVERY OF MESSAGES HELD INAPPLICABLE TO TRANSMISSION OF MONEY.—Telegraph company's limitation of liability for damages caused by failure to transmit, or delay, or mistakes in transmission of messages, in rules and regulations filed with the Interstate Commerce Commission under Act Cong. June 18, 1910 (U. S. Comp. Stats., § 8563 et seq.), did not affect the company's liability for failure to transmit money by telegraph under its contract so to do.

2. TELEGRAPHS AND TELEPHONES — COMMERCE — IMPOSITION OF LIA-
BILITY ON TELEGRAPH COMPANY FOR FAILURE TO TRANSMIT
MONEY HELD NOT REGULATION OF INTERSTATE COMMERCE.—Tele-
graph company *held* liable for its negligent failure to transmit
money by telegraph under its contract so to do, the enforcement
of such liability not constituting a regulation of interstate com-
merce.

3. TELEGRAPHS AND TELEPHONES — TELEGRAPH COMPANY LIABLE FOR
FAILURE TO TRANSMIT MONEY BY TELEGRAPH UNDER ITS CONTRACT
TO SO DO.—A telegraph company, having contracted to transmit
money by telegraph to a person at a distant point, is liable in
damages for its failure, due to negligence or otherwise, to promptly
transmit or pay the money to such person.

4. TELEGRAPHS AND TELEPHONES—FAILURE TO TRANSMIT FUNDS HELD
PROXIMATE CAUSE OF INJURY TO HEALTH CAUSED BY POVERTY OF
PERSON TO WHOM IT WAS SENT.—Where telegraph company was
fully informed that person to whom money was being sent was
without funds, was expecting the money, and was suffering hard-
ships, embarrassments, mental anguish and physical pain, because
without funds, but failed to transmit the money promptly, its
failure to so do was the proximate cause of the pain, suffering,
and injury to such person's health, caused by want of funds after
the money had been so sent.

5. TELEGRAPHS AND TELEPHONES—MEASURE OF DAMAGES FOR TELEGRAPH
COMPANY'S FAILURE TO PROMPTLY TRANSMIT MONEY STATED.—
Where telegraph company was fully informed that person to whom
money was being sent was wholly without funds and was suffer-
ing mental anguish and physical pain by reason thereof, the com-
pany on failure to promptly transmit the money became liable
for injury to such person's health proximately caused thereby in
such amount as will reasonably admeasure such damages and for
the return of the money and transmittal charges paid with in-
terest, but not for any humiliation suffered.

6. TELEGRAPHS AND TELEPHONES — COMPLAINT ALLEGING TELEGRAPH
COMPANY'S FAILURE TO TRANSMIT MONEY HELD TO ENTITLE PLAIN-
TIFF TO PUNITIVE DAMAGES.—Complaint, alleging that telegraph
company which agreed to transmit money to plaintiff was fully ad-

---

2. State law affecting telegraphs as regulation of interstate com-
merce, notes, 2 Ann. Cas. 513; 21 Ann. Cas. 819; Ann. Cas. 1918C,
1039; 36 L. R. A. (N. S.) 220.

5. Right of addressee of telegram to sue for damages for mental
anguish resulting from negligence in delivery of telegram, notes,
1 Ann. Cas. 355; 13 Ann. Cas. 399; Ann. Cas. 1912D, 838; 49
L. R. A. (N. S.) 275.

vised that plaintiff was wholly without funds and was suffering embarrassment and physical pain by reason thereof, but wantonly and by gross neglect failed to transmit the money, *held* to entitle plaintiff to punitive damages.

APPEAL from a judgment of the Superior Court of the County of Graham. Frank B. Laine, Judge. Reversed.

Mr. E. L. Spriggs, for Appellant.

Mr. W. C. McFarland and Mr. Francis R. Stark, for Appellee.

FLANIGAN, J.—In this action, brought by the appellant against the appellee, the complaint alleges that on July 3, 1920, in the town of Safford, Graham county, Arizona, one J. W. Morris, as the agent of the plaintiff and for his use and benefit, entered into an agreement with the defendant, a corporation engaged in the business of transmitting telegraphic messages and receiving and transmitting funds, by the terms of which the defendant agreed to immediately pay to the plaintiff in person, in Eureka, Kansas, the sum of $25; the agent, Morris, paid to the defendant for such service the sum of $26.22, taking the defendant's receipt therefor reading as follows:

"Western Union Telegraph Company,
          "Safford, Ariz., 7/3/20.
"Received from Mrs. O. Morris twenty-five and No/100 dollars, to be paid to Otho Morris at Eureka, Kans., subject to the terms and conditions of money transfer order of this date.
          "[Signed]    MAUD WALPOLE,
                    "Transfer Agent.

"Charges paid $1.22."

That the plaintiff on the second, third, fourth, and fifth days of July, 1920, was in Eureka, Kansas, and

on each of said days applied in person to the office of defendant in said town for the money but was advised on each of said occasions that there were no funds there to his credit; that during these times the defendant was fully advised, and well knew that the plaintiff was in Eureka, Kansas, and wholly without funds, and that he was expecting relief from the said agent in Safford, Arizona, through the defendant, and that the plaintiff was suffering hardships, embarrassments, mental anguish, and physical pain; that, in fact, plaintiff was wholly without funds, and by reason of the nonpayment of said money he was forced to sleep upon the ground, without bedclothes, and to ask alms; was without sufficient food, and by reason of his exposure contracted rheumatism and a severe cold, and has suffered great physical pain therefrom and partially lost the hearing in one ear; that he is entitled to damages for the return of the money paid, and to the further sum of $2,500 to compensate him for the loss of his health and for the humiliation and pain he suffered by reason of defendant's negligence and failure to pay him said money; that the negligence and failure of said defendant to pay said money was wanton, willful, and gross neglect, and a wanton disregard of plaintiff's rights.

In answer to the complaint the defendant pleaded by demurrers, general and special, a general denial and certain special defenses set forth as follows:

"Defendant, further answering said amended complaint, alleges that it was contracted and agreed between plaintiff and defendant that the message transmitting the said sum of $25, alleged to have been received by defendant on the third day of July, 1920, was received by defendant and transmitted subject to the following conditions printed upon the application to transmit said money, in words and figures as follows, to wit: 'Safford, 7–2–1920. Domestic or-

ders will be canceled and refund made to sender if payment cannot be effected within seventy-two hours after receipt at paying office.'

"That in pursuance of said condition defendant ·canceled said order, and now has in its possession the said sum of $25 subject to the order of the sender of said message, and now tenders the same to the sender thereof or order and pleads this tender as full satisfaction of its liability for said sum of $25.

"Defendant, further answering, alleges that on the third day of July, 1920, it was engaged in the transmission of both intrastate and interstate messages by telegraph, and had adopted just and reasonable charges and classification of messages and rates therefor; that defendant did, in pursuance of the Acts of Congress to Regulate Commerce as amended June 18, 1910, adopt and establish reasonable rules and regulations in respect to interstate messages, including repeated and unrepeated messages by printed rules and regulations for the year 1920, and that a copy of said rules and regulations are on file in the office of the Interstate Commerce Commission, and a printed copy on file in all of its offices in the United States, including its office in Safford, Arizona; that said rules and regulations are at all times subject to inspection by its patrons and others; that among the rules and regulations so printed and in the office of defendant on the third day of July, 1920, were the following:

" 'To guard against mistakes or delays, the sender of a message should order it repeated, that is, telegraphed back to the originating office for comparison. For this, one-half the unrepeated message rate is charged in addition. Unless otherwise indicated on its face, this is an unrepeated message and paid for as such, in consideration whereof it is agreed between the sender of the message and this company as follows:

" '1. The company shall not be liable for mistakes or delays in transmission or delivery or for nondelivery, of any unrepeated message, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery or for

nondelivery, of any repeated message, beyond fifty times the sum received for sending the same, unless specifically valued; nor in any case for delays arising from unavoidable interruption in the working of its lines; nor for errors in cipher or obscure messages.

"'2. In any event the company shall not be liable for damages for any mistakes or delays in the transmission or delivery or for the nondelivery, of this message, whether caused by the negligence of its servants or otherwise, beyond the sum of fifty dollars, at which amount this message is hereby valued, unless a greater value is stated in writing hereon at the time the message is offered to the company for transmission, and an additional sum, paid or agreed to be paid based on such value equal to one-tenth of one per cent thereof.'

"That the message so sent, which is the basis of this action was an unrepeated message sent from Safford, Arizona, to Eureka, Kansas; the same being an interstate message, governed and controlled by the act of Congress of June 18, 1910, above mentioned. That under said Act, and the printed rules and regulations of defendant as above set out, defendant is not liable for any sum in excess of the price of unrepeated messages, to wit, the sum of $1.22, paid defendant, which sum is hereby tendered the plaintiff in full satisfaction of all and any liability under said act, and the rules and regulations above set forth."

The plaintiff by reply specially denied these allegations of the answer. Thereafter the cause was submitted to the court under a stipulation which, with other matters, recited that—

"The only matter contested herein is the rightfulness of the plaintiff to recover under the law governing causes of action as alleged in plaintiff's complaint."

"Judgment on the pleadings" was thereupon rendered in favor of the plaintiff for the sum of $26.22, with costs in favor of the defendant in the sum of

five dollars because of the failure of plaintiff to accept the tender of the sum adjudged to plaintiff under the offer of defendant that judgment might be entered for such amount. The stipulation is anomalous in form and nature, but we take the question to be whether the complaint, together with the special defenses contained in the answer of defendant taken as true, shows in any aspect a cause of action upon which plaintiff may recover.

The contentions of the defendant are based principally upon the premise that under the federal statutes (Act June 18, 1910, c. 309; 36 Statutes at Large, 539 [5 Fed. Stats. Ann., 2d ed., p. 1108; U. S. Comp. Stats. 1913, § 8563 et seq.]), making telegraph, telephone, and cable companies subject to the Act to Regulate Commerce, no liability exists for a mistake or delay in transmitting or for nondelivery of an unrepeated message beyond the amount received for sending the same, in this case the sum of $1.22. The principal authorities cited in support of this contention are the cases of *Postal Telegraph-Cable Co. v. Warren-Godwin Lbr. Co.*, 251 U. S. 27, 64 L. Ed. 118, 40 Sup. Ct. Rep. 69, and *Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U. S. 566, 65 L. Ed. 1094, 41 Sup. Ct. Rep. 584, decided by the United States Supreme Court June 1, 1921. In these cases it is held that under the act of Congress referred to a telegraph company, engaged in transmitting messages in interstate commerce, which provides one rate for unrepeated interstate messages and another higher rate for repeated messages, may stipulate for a reasonable limitation of its liability when the lower rate is paid, and that the limitation so made is the sole measure of recovery; the validity of such regulations not being determinable by state laws.

There is no question that these decisions, as stated by the court in *Postal Telegraph-Cable Co. v. War-*

*ren-Godwin Lbr. Co., supra,* conclusively determine that the act referred to was an exercise by Congress of its authority to bring under federal control the interstate business of telegraph companies, and therefore was an occupation of the field by Congress which excluded state action, so far as the act—

"was designed to and did subject such companies as to their interstate business to the rule of equality and uniformity of rates which it was manifestly the dominant purpose of the Act to Regulate Commerce to establish, a purpose which would be wholly destroyed if, as held by the court below, the validity of contracts made by telegraph companies as to their interstate commerce business continued to be subjected to the control of divergent and it may be conflicting local laws."

And it was accordingly held in *Western Union Tel. Co.* v. *Boegli,* 251 U. S. 315, 64 L. Ed. 281, 40 Sup. Ct. Rep. 167, that—

The provisions of the law "bringing telegraph companies under the Act to Regulate Commerce as well as placing them under the administrative control of the Interstate Commerce Commission so clearly establish the purpose of Congress to subject such companies to a uniform national rule as to cause it to be certain that there was no room thereafter for the exercise by the several states of power to regulate, by penalizing the negligent failure to deliver promptly an interstate telegram, and that the court below erred therefore in imposing the penalty fixed by the state statute."

And in the latest expression of that court on the effect of the act in *Western Union Tel. Co.* v. *Esteve Bros. & Co., supra,* which was an action to recover damages caused by error in the wording of an interstate message as delivered, it is said:

"The lawful rate having been established, the company was by the provisions of section 3 of the Act to Regulate Commerce prohibited from grant-

ing to anyone an undue preference or advantage over the public generally. For, as stated in *Postal Telegraph-Cable Co.* v. *Warren-Godwin Lumber Co.,* *supra,* 251 U. S. 30 [64 L. Ed. 118, 40 Sup. Ct. Rep. 69], the 'act of 1910 was designed to and did subject such companies, as to their interstate business, to the rule of equality and uniformity of rates.' If the general public, upon paying the rate for an unrepeated message, accepted substantially the risk of error involved in transmitting the message, the company could not, without granting an undue preference or advantage, extend different treatment to the plaintiff here. The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.

"The act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract, by which a legal liability could be modified, but as a matter of law by which a uniform liability is imposed."

These cases and many others, especially such as are cited with approval in the Postal-Telegraph Cable Co. case, are concerned with the purpose and effect of the act of Congress to establish uniform and equal rates for the transmission and delivery of messages in interstate commerce by telegraph companies, where such rates have been fixed by the company under the act, as against attempts to vary the

measure of liability so fixed as a part of the rate, either by statutory penalties for failure to transmit or deliver messages or the like, or by allowing recovery of damages for the breach of the contract by which the message was received for transmission.

In the case at bar, however, the liability sought to be imposed is in no wise an attempt to fix or regulate any rate or charge of the telegraph company. Such liability does not arise from the failure to send a telegraphic message, as such, for plaintiff. The real contract was that the defendant, upon payment of the sum of $25 and the charge for transmission at Safford, Arizona, would pay to the plaintiff, upon his demand, at Eureka, Kansas, that sum of money, and in order to effect the transfer would without unnecessary delay inform its agent by telegraph at the latter place of the credit. While the plaintiff's agent was availing herself of the facilities possessed by the defendant for rapid transmission of the money, neither she nor the plaintiff was directly concerned with the ''service message'' between those points to effect that purpose. And as it does not appear that the defendant, as a part of the rate charged for the service it agreed to render, assumed any liability alternative to that which might be properly fixed by law for its failure to do what it agreed, it seems plain that the existing uniformity and equality of the rate for all similar services actually rendered according to agreement cannot be affected by plaintiff's recovery here of the damage he sustained because of the failure to render the agreed service. The plaintiff was therefore not concerned with a telegraphic message which, by any reasonable interpretation of the agreement, was governed by the limitation of liability set forth in the answer relating to such messages. The only limitation of liability which is asserted in the answer, which has

any pertinency, is the one spoken of therein as a condition printed upon the application to transmit, reading as follows:

"Safford, 7-2-1920.
"Domestic orders will be canceled and refund made to sender if payment cannot be effected within seventy-two hours after receipt at paying office."

But as it is not disclosed by the answer, nor anywhere in the pleadings, that the failure to transmit the credit or to · effect the payment of the money within the space of seventy-two hours after receipt at the paying office was not due, as alleged in the complaint, to the negligence of the defendant itself, it is clear that we may dismiss that allegation entirely from consideration.

We thus conclude that there is no rate or regulation prescribed by the company which in contravention of the act of Congress could be in any way affected or impaired by holding the company liable for its negligent failure to carry out its contract in this case. Does the imposition of such a liability constitute in any sense an illegal interference with interstate commerce repugnant to the act of Congress, which, as it is held, has brought under federal control the interstate business of telegraph companies, and therefore occupied the field to the exclusion of state action? We think the answer to this inquiry is plainly a negative one.

The rules governing the liability of interstate carriers as they existed prior to the enactment of the Carmack Amendment (U. S. Comp. Stats., §§ 8604a–8604aa), and the effect on such rules of the adoption of the amendment as recognized and enunciated in the decisions of the Supreme Court of the United States, lead by analogy, if not directly, to the rules which govern the case we are considering.

In *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 44 L. R. A. (N. S.) 257, 57 L. Ed. 314, 33 Sup. Ct. Rep. 148 (see, also, Rose's U. S. Notes), the court, speaking of the rule of a carrier's liability before the passage of the Carmack Amendment, used the following language:

"The rule of carriers' liability, for an interstate shipment of property, as enforced in both Federal and state courts, was either that of the general common law, as declared by this court and enforced in the Federal courts throughout the United States (*Hart* v. *Pennsylvania R. Co.,* 112 U. S. 331, 28 L. Ed. 717, 5 Sup. Ct. Rep. 151), or that determined by the supposed public policy of a particular state (*Pennsylvania R. Co.* v. *Hughes,* 191 U. S. 477, 48 L. Ed. 268, 24 Sup. Ct. Rep. 132), or that prescribed by statute law of a particular state (*Chicago, M. & St. P. R. Co.* v. *Solan,* 169 U. S. 133, 42 L. Ed. 688, 18 Sup. Ct. Rep. 289)."

And, holding that the effect of the Carmack Amendment was to supersede all state regulations with reference to the subject of the liability of a carrier under contracts for interstate shipment, the court further said:

"But it is equally well settled that until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular state, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the state. Such regulations would fall within that large class of regulations which it is competent for a state to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the state over such carriers, and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, although interstate commerce may be indirectly affected [citing cases]. In the Solan case [*Chicago, M. & St. P. R. Co.* v. *Solan,* 169 U. S. 133, 137, 42 L. Ed. 688, 692,

18 Sup. Ct. Rep. 289], cited above, it was said of such state legislation: 'They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits.' "

After reviewing the case of *Pennsylvania R. Co.* v. *Hughes,* 191 U. S. 477, 48 L. Ed. 268, 24 Sup. Ct. Rep. 132, which is an exposition and application of the general rule given in the language last quoted, the court proceeded to consider the facts in the Croninger case, upon the assumption that it would be governed by the former decisions "unless the subsequent legislation of Congress is such as to indicate a purpose to bring contracts for interstate shipments under one uniform rule of law, not subject to the varying policies and legislation of particular states."

The opinion in the Croninger case makes it clear that prior to the passage of the Carmack Amendment, or other legislation directly affecting the subject matter of contracts for interstate carriage, the several states had not been deprived of their power to safeguard the general public against acts of nonfeasance and misfeasance committed within their limits, although thereby interstate commerce might be indirectly affected, and that a carrier's liability for failure to perform its contract concerning interstate shipments of property was such as might be prescribed by the laws of the various states.

As was said in the Solan case, 169 U. S. 133, 42 L. Ed. 688, 18 Sup. Ct. Rep. 289:

"A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable, according to the law of the state, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, the right of action for the consequent damage is given by the local law."

*Western Union Tel. Co.* v. *Commercial Milling Co.,* 218 U. S. 406, 21 Ann. Cas. 815, 36 L. R. A. (N. S.) 220, 54 L. Ed. 1088, 31 Sup. Ct. Rep. 59 (see, also, Rose's U. S. Notes), deals with an action for damages for failure to deliver a telegram given to the telegraph company at Detroit, Michigan, to be delivered at Kansas City, Missouri. This telegram was sent, accepting an offer of the sale of 10,000 bushels of wheat, but was not delivered. The company being sued set up the conditions by which it claimed exemption from liability, being the same as are set forth in this case for unrepeated messages. By a statute of the state of Michigan it was provided that a telegraph company could not limit its liability for its negligent failure to deliver a telegram addressed to a person in another state. Upholding the state law and declaring the exemption inoperative and void, the court said:

"In the James case the power of the state was exercised in aid of commerce. In the latter case prior cases were reviewed and the principle determining the validity of the respective statutes was declared to be whether they could be 'fully carried out and obeyed without in any manner affecting the conduct of the company with regard to the performance of its duties in other states.' It was said that a statute of that kind, as it would not 'unfavorably affect or embarrass' the telegraph company, in the course of its employment should be held valid 'until

Congress speaks upon the subject.' And it was observed that 'it is a duty of a telegraph company which receives a message for transmission, directed to an individual. at one of its stations, to deliver that message to the person to whom it is addressed with reasonable diligence and in good faith. That is a part of its contract, implied by taking the message and receiving payment therefor.' And there can be no liability to the sender of the message as well as to him who is to receive it. The telegraph company in the case at bar surely owed the obligation to the milling company to not only transmit the message, but to deliver it. For the failure of the latter it sought to limit its responsibility, to make the measure of its default not the full and natural consequence of the breach of its obligation, but the mere price of the service, relieving itself, to some extent, even from the performance of its duty; a duty, we may say, if performed or omitted, may have consequences beyond the damage in the particular instance. This the statute of the state, expressing the policy of the state, declares shall not be. For the reasons stated we think that this may be done, and that it is not an illegal interference with interstate commerce."

And as shown by the decision in that case, no distinction can be made between a statutory liability of the kind mentioned and a liability arising at common law.

While the decision made in the Milling Company case could not, of course, be rendered under the act of Congress as now amended by the act of June 18, 1910, the case is conclusive to show that liability of the defendant here to answer for the natural and probable consequences of its negligence may exist and be enforced without repugnance to the federal law.

Under the authority of these decisions, applied to the facts of the case at bar, it must be held that the liability of the defendant for its negligent failure to transmit or pay the money to plaintiff at

Eureka, Kansas, arising out of a transaction not directly governed by the Act to Regulate Commerce, or regulation made thereunder, calls for the application of the principle that the defendant is answerable according to the local law for an act of nonfeasance or misfeasance committed within the limits of a state, and that the enforcement of such liability is in no just sense a regulation of interstate commerce.

In the case at bar it is alleged that the plaintiff, by his agent, sent the money from Safford, Arizona, to himself at Eureka, Kansas. We have therefore not to deal with the relative or distinct remedial rights of sender and addressee, as such. Under familiar principles of law, we must presume, nothing to the contrary appearing, that the law of Kansas in that regard is the same as the law of this state. The question, therefore, to which we next address our attention is, Do the facts stated show a cause of action, under the law of this state, for the negligent failure of defendant to transmit and pay said money to the plaintiff?

That a telegraph company is liable in damages for its failure, due to negligence or otherwise, to promptly transmit or pay a sum of money to a person at a distant point, cannot be questioned. It is said by Jones, in his work on Telegraph and Telephone Companies:

"It has become a very common thing for money to be transmitted by telegraph companies; or, rather, means are furnished by which the same results are accomplished. When such undertakings have been assumed, it is as much the duty to make speedy transmission of the money, or accomplish the same results as it is to transmit messages pertaining to other business. So, where they are employed to transmit money and there is a failure to do so, or there is an unreasonable delay in delivery, the company will

be liable to the party to whom the money was sent for the actual damages sustained thereby. The measure of damages in such cases is the interest on the money from the time it should have been delivered, to the time it was actually delivered, together with the cost of the message. Any loss other than this would be too remote. . . . '' Section 567.

See, also, 37 Cyc. 1775, ''Money Transfer Messages,'' in which paragraph also a limitation of the measure of damages to interest on the money from the time of default till tender is said to be the ordinary rule, qualified, however, by the statement that—

''The company may have notice of facts and circumstances such as to render it liable for special damages.''

The principal cases cited in support of the limitation of the damages to interest on the money from the time of default to the time it is delivered, together with the cost of the message, are the following: *Robinson* v. *Western Union Tel. Co.*, 24 Ky. Law Rep. 452, 57 L. R. A. 611, 68 S. W. 656; *Smith* v. *Western Union Tel. Co.*, 150 Pa. 561, 24 Atl. 1049; *De Voegler* v. *Western Union Tel. Co.*, 10 Tex. Civ. App. 229, 30 S. W. 1107; *Ricketts* v. *Western Union Tel. Co.*, 10 Tex. Civ. App. 226, 30 S. W. 1105.

The Robinson, De Voegler, and Ricketts cases were actions brought to recover damages for mental anguish and suffering, recoveries of which were denied. But in the Ricketts case the court uses the following language:

''If the appellant contracted with appellee to transmit a sum of money to her son, and the contract was violated on appellee's part by failing to transmit the same within a reasonable time, then appellee would be liable for such damages as might have been fairly within the reasonable contemplation of the parties at the time such contract was made.''

In *Smith* v. *Western Union Tel. Co., supra,* it was held that, in the absence of pecuniary loss resulting from defendant's failure to transmit money to a bank for payment of the plaintiff's note, no recovery could be had. But it is stated in the course of the opinion:

"It is true that in an action for the breach of a contract to pay money for a special object which was known to the party agreeing to make the payment, damages directly and naturally resulting from the breach and therefore supposed to have been in contemplation of the parties, may be given in addition to interest, but such damages must be shown by the evidence."

In the case of *Western Union Tel. Co.* v. *Simpson,* 73 Tex. 422, 11 S. W. 385, the effect of knowledge of the peculiar conditions and circumstances surrounding the transaction by which the money is sent is spoken of as follows:

"To authorize a recovery of damages for mental distress resulting from the nonperformance of a contract for the payment of money it must be alleged and proved that the party contracting to make the payment was informed at the time of making the contract of the peculiar condition and circumstances of the party for whose benefit the contract was made, which rendered the prompt performance of more than ordinary importance, that the party contracting to make the payment may anticipate the more serious consequences of the breach."

In the case of *Barnes* v. *Western Union Tel. Co.,* 27 Nev. 438, 103 Am. St. Rep. 776, 1 Ann. Cas. 346, 65 L. R. A. 666, 76 Pac. 931, it is held that a telegraph company which negligently fails to deliver a telegram from one in a strange city, a long distance from home, asking for money, where by reason of such failure he is compelled to attempt to make the journey on foot, is liable for the price of the tele-

gram, compensation for time lost, the price of meals and lodging during the time he is *en route,* and damages for the mental worry and distress accompanying the physical fatigue and exertion caused by the journey. The rule was there announced that for breach of contract damages are recoverable which may be supposed to have been contemplated by the parties thereto, and as the company was informed that the party to receive the money was without funds, in a strange city, 400 miles from home, such damages were held to be recoverable.

In the case of *Western Union Tel. Co.* v. *Wells,* 50 Fla. 474, 111 Am. St. Rep. 129, 7 Ann. Cas. 531, 2 L. R. A. (N. S.) 1072, 39 South. 838, the effect of the knowledge of the company of the conditions on its liability for damages is considered. The company undertook to transmit the sum of $25 from Ocala, Florida, to the city of Philadelphia, and by reason of the willful and wrongful refusal of its agent at the latter place to pay said sum the plaintiff and his family suffered great pain and anguish of mind and body, and made a trip without food or funds. It was said:

"The willful refusal without adequate excuse of the company to pay over to him that sum entitled him undoubtedly to a substantial recovery for the resultant injury to him thereby directly occasioned in the mortification, inconvenience, and physical and mental suffering incident to traveling a great distance without food or other necessities for himself and for those to whom he owed the highest natural obligations."

In the case of *Western Union Tel. Co.* v. *Lawson,* 182 Fed. 369, 105 C. C. A. 451, for the failure to deliver a business telegram whereby plaintiff was not advised of a $500 loan, by the use of which she could have avoided a sacrifice of her property, the

defendant was held liable in compensatory damages to the plaintiff, being advised generally that the message was important.

And, as is said in Sutherland on Damages, fourth edition, section 969:

"It does not appear to be necessary that the company should be apprised of details if the purpose of the message is made known."

In the case at bar it appears from the complaint that at the time the money was agreed to be sent the defendant was fully informed that the plaintiff was in Eureka, Kansas, wholly without funds, and was expecting the money, and that he was suffering hardship, embarrassments, mental anguish, and physical pain. Notwithstanding this, it neglected to pay him the money, and such failure was wanton, willful, and gross neglect. Under the allegations of the complaint it must be assumed that had the defendant complied with its contract the consequences detailed therein as the result of its failure would not have supervened. While it is true that the plaintiff's condition of want and poverty was not in the first instance due to any act or omission of defendant, the fact remains that, had it performed its contract, the evil results spoken of would not have followed. The wrongful conduct and gross neglect of the defendant must therefore be regarded as the proximate cause of such results. For illustrative cases see the following: *Stiles* v. *Western Union Tel. Co.*, 2 Ariz. 308, 15 Pac. 712; *Hendershot* v. *Western Union Tel. Co.*, 106 Iowa, 529, 68 Am. St. Rep. 313, 76 N. W. 828, and cases cited in the notes to *Seifert* v. *Western Union Tel. Co.*, 129 Ga. 181, 121 Am. St. Rep. 210, 11 L. R. A. (N. S.) 1149, 58 S. E. 699, which apply the principle in cases where, though a cause sufficient to bring about the result already existed, the company was held liable for the con-

tinuance or aggravation of a condition preventable by its performance. See, also, section 965, Sutherland on Damages.

Under the circumstances of this case it appears to us that for the failure to carry out its contract defendant is liable to compensate the plaintiff for the injurious results proximately caused thereby to the health of plaintiff, with the accompanying pain and suffering, and the suffering endured in consequence of his exposure, in such an amount as will fairly and reasonably admeasure such damages in terms of money where no exact pecuniary admeasurement may be possible; also, for the return of the money and transmittal charges paid by him, with interest thereon; excluding, however, as a recoverable element the item of humiliation as a species of purely mental suffering unrelated to any physical injury.

The argument for appellant is based largely upon the theory that the allegations of the complaint call for the imposition of punitive damages. The complaint alleges facts sufficient upon which to sustain such an award, but if the damages are in fact punitive or exemplary in character for any part of the sum prayed for, it would seem proper that the tribunal which is to determine the facts of the case should determine the amount to be allowed therefor, if any, after hearing the evidence. For this reason, and the ambiguous character of the stipulation as limiting in an aspect the decision to the question of the sufficiency of the facts pleaded to state any cause of action, we feel precluded from considering the case as a proper one to render judgment for appellant here.

The judgment rendered will therefore be reversed and the cause remanded to the lower court, with instructions to proceed in a manner not inconsistent with this opinion.

ROSS, C. J., and McALISTER, J., concur.