WESTERN UNION TELEGRAPH COMPANY *v.*
ESTEVE BROTHERS & COMPANY

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
FIFTH CIRCUIT.

No. 491. Argued April 12, 13, 1921.—Decided June 1, 1921.

A company engaged in transmitting telegraphic messages in this country and by cable between here and France, established a tariff offering a lower rate for unrepeated and a higher rate for repeated messages, and limiting its liability for mistakes in transmitting unrepeated messages to the tolls accruing to it therefrom, and filed the tariff with the Interstate Commerce Commission under the Interstate Commerce Act, as amended June 18, 1910, c. 309, § 7, 36 Stat. 539; an unrepeated message sent by plaintiffs from Spain passed over other lines to Havre, where it was received by the com-

pany and sent to New Orleans, an error being introduced on the land lines in this country which caused the plaintiffs heavy loss. The provision limiting liability was not expressed on the blank used in sending; nor did the senders know of its adoption and filing. *Held:*

1. Whatever the legal incidents of the transmission over the foreign lines, the company in carrying the message over its own lines from Havre was governed by the Interstate Commerce Act, as amended. P. 570.

2. The senders of the message were bound as a matter of law by the provision limiting liability, without regard to their knowledge or assent, because it was a part of a lawfully established rate which could not be departed from without creating an undue preference or advantage in violation of § 3 of the statute. P. 570. *Boston & Maine Railroad* v. *Hooker*, 233 U. S. 97; *Galveston, Harrisburg & San Antonio Ry. Co.* v. *Woodbury*, 254 U. S. 357.

3. *Quære*, Whether the rule that carriers of goods, in order to limit liability for negligence, must offer an alternative rate attended by full liability, (*Union Pacific R. R. Co.* v. *Burke*, 255 U. S. 317), applies to telegraph and cable companies? P. 574.

4. Where a cable company offered a lower rate, with limited liability, for unrepeated messages, and a higher rate for repeated messages, with a higher but still limited liability, *held*, that the senders of an unrepeated message who paid the lower rate could not escape its attendant limitation upon the ground that liability under the higher was also limited, since the latter limitation, if invalid, would not bind those who used the higher rate, and the question of its validity was not material in the case. P. 575.

268 Fed. Rep. 22, reversed.

CERTIORARI to review a judgment of the Circuit Court of Appeals affirming a judgment rendered against the present petitioner, by the District Court, in an action for damages resulting from a mistake in a telegram. The facts are stated in the opinion.

*Mr. Rush Taggart* and *Mr. John G. Milburn,* with whom *Mr. Francis Raymond Stark, Mr. Joseph L. Egan* and *Mr. W. B. Spencer* were on the brief, for petitioner.

*Mr. Monte M. Lemann,* with whom *Mr. J. Blanc Monroe* was on the brief, for respondent.

Mr. Justice Brandeis delivered the opinion of the court.

In September, 1917, the Western Union Telegraph Company delivered to Esteve Brothers & Company at New Orleans, Louisiana, an unrepeated cable message from the latter's main office at Barcelona, Spain, directing a sale for future delivery of two thousand bales of cotton. The message actually sent had directed the sale of two hundred bales. The error in transmission resulted in a loss to Esteve Brothers & Company of $31,095. To recover compensation for this loss they sued the Western Union in a state court of Louisiana. The case was removed to the Federal District Court and there was tried by jury upon these additional stipulated facts:

The message was sent over lines of the Spanish Government Telegraph from Barcelona to Paris and thence over lines of the French Government to Havre. There it was delivered to the Western Union, transmitted by its cable to New York City and thence over its land lines to New Orleans. The error in transmission occurred on these land lines. The charge of $6.60, paid at Barcelona for transmitting the message, represented the sum of the local rates on the several connecting lines. The Western Union's share was $4.65; and of this $3.75 was apportioned to the cable system and 90 cents to the land lines. This Western Union rate was established by its tariff of telegraph and cable rates, in force since some time prior to June 18, 1910. Under the act of that date, c. 309, 36 Stat. 544, making telegraph and cable companies subject to the Act to Regulate Commerce, this tariff had been filed with the Interstate Commerce Commission in May, 1916, by its permission and pursuant to an appropriate resolution of the company. The tariff so filed embodied the long used classification of messages, rules and regulations, including the provision that the company "shall not

be liable for mistakes  .  .  .  in transmission  .  .  . of any unrepeated message, beyond the amount of that portion of the tolls which shall accrue to it." The plaintiffs did not in fact assent to this limitation of liability. They did not, in sending the message at Barcelona, use a blank containing the provisions so limiting liability. They did not have actual knowledge of the resolution of the company or of the filing of the tariffs with the Interstate Commerce Commission.

The plaintiffs contended at the trial that in view of the above facts they were entitled to a verdict for the full amount of their loss. The company contended that, since the message had not been repeated, the verdict should be limited to $4.65, the amount received by it as tolls. A verdict was directed for $31,095 with interest; judgment thereon was affirmed by the United States Circuit Court of Appeals for the Fifth Circuit, 268 Fed. Rep. 22; and a petition for writ of certiorari was granted. 254 U. S. 624. The sole question presented for our decision is the amount of damages recoverable.

For more than fifty years prior to the transaction here in suit the Western Union had maintained these two classes of rates for general cable and telegraph service. The usual or basic rate was for service practically at the sender's risk, liability being limited to the amount of the toll collected. Another special rate entitled the sender to have the message repeated back to the point of origin and rendered the company liable in case of mistake or nondelivery up to fifty times the amount of the extra charge. The extra charge for this additional service was for telegrams one-half and for cables one-quarter of the basic rate. In *Primrose* v. *Western Union Telegraph Co.*, 154 U. S. 1, decided in 1894, this classification of rates and the limitations upon the company's liability were declared by this court to be reasonable and valid, in the absence of willful misconduct or gross negligence. The

limitation upon the company's common-law liability was held to be in the nature of contract; and this liability unlike that of a common carrier, was not an insurer's. It was merely for the damage flowing from failure to use due care in transmission. *Primrose* v. *Western Union Telegraph Co., supra,* 14. Since the limitation of liability was in the nature of contract, the provision had to be brought home to the sender of a message in order to be legally binding upon him. Assent by the sender was ordinarily established if the message was written upon one of the company's blanks which set forth the limitation of liability. *Primrose* v. *Western Union Telegraph Co., supra,* 25; compare *Cau* v. *Texas & Pacific Ry. Co.,* 194 U. S. 427, 431. Whether, in view of long established practice, the mere sending of a message, although not written on such a blank, imported assent to the usual terms of the rate involved then an issue of fact. See *New Jersey Navigation Co.* v. *Merchants' Bank,* 6 How. 344, 383. The question presented for our decision is whether since the amendment of June 18, 1910, to the Act to Regulate Commerce, the sender is, without assent in fact, bound as matter of law by the provision limiting liability, because it is a part of the lawfully established rate.

The Act of June 18, 1910, c. 309, § 7, 36 Stat. 539, 544, broadened the scope of the Act to Regulate Commerce to include "telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from [a] State . . . to any foreign country." And whatever may have been the legal incidents of transmitting the message from Barcelona to Havre under Spanish and French law, the Western Union in sending the message over its own lines from Havre to New Orleans was governed by the provisions of that act. *Galveston, Harrisburg & San Antonio Ry. Co.* v. *Woodbury,* 254 U. S. 357. In the third paragraph of § 1 of the amended act Congress provided that messages might be "classified

into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as are just and reasonable, and different rates [might] be charged for the different classes of messages." Acting, in May, 1916, under the authority of that provision, the Western Union by appropriate action approved the tariff involved in the present case and by permission of the Interstate Commerce Commission filed with it the tariff, including the provisions here in question. The company was not required so to do by the terms of the act or by any order of the Commission; compare 25th Annual Report I. C. C. (1911) pp. 5, 6. But the rate, long before established, then formally adopted and filed, was thereafter the only law-ful rate for an unrepeated message, and the limitation of liability became the lawful condition upon which it was sent. *Postal Telegraph-Cable Co.* v. *Warren-Godwin Lumber Co.*, 251 U. S. 27, 30; *Clay County Produce Co.* v. *Western Union Telegraph Co.*, 44 I. C. C. 670, 674.

The lawful rate having been established, the company was by the provisions of § 3 of the Act to Regulate Com-merce prohibited from granting to anyone an undue pref-erence or advantage over the public generally. For, as stated in *Postal Telegraph-Cable Co.* v. *Warren-Godwin Lumber Co.*, *supra*, 30, the "Act of 1910 was designed to and did subject such companies as to their interstate business to the rule of equality and uniformity of rates." If the general public upon paying the rate for an un-repeated message accepted substantially the risk of error involved in transmitting the message, the company could not, without granting an undue preference or advantage extend different treatment to the plaintiffs here. The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.

The Act of 1910 introduced a new principle into the legal relations of the telegraph companies with their

patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several States. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect. This principle was established in cases involving the limitation upon a carrier's liability for baggage by *Boston & Maine Railroad* v. *Hooker*, 233 U. S. 97, and *Galveston, Harrisburg & San Antonio Ry. Co.* v. *Woodbury*, 254 U. S. 357. In the former case it was said, "If the charges filed were unreasonable, the only attack that could be made upon such regulation [limiting liability] would be by proceedings contesting their reasonableness before the Interstate Commerce Commission. While they were in force they were equally binding upon the railroad company and all passengers whose baggage was transported by carriers in interstate commerce." So here the limitation of liability attached to the unrepeated cable rate is binding upon all who send messages to or from foreign countries until it is set aside as unreasonable by the Commission.

It is strongly argued that the rule is not applicable to the situation before us, because of the difference in the provisions of law which govern the establishment of railroad and of telegraph rates. The railroad rate is established, and can only be established by filing the tariff with

the Commission.   Telegraph companies may initiate
rates without filing tariffs with the Commission, (*Clay
County Produce Co.* v. *Western Union Telegraph Co.,
supra*).   Plaintiffs insist that it is the filing and subsequent
publication of the railroad rate which gives it the force of
law and requires the shipper to take notice of it.   But
the contention, by dwelling unduly upon the procedural
features of the act, would defeat the end which Congress
had in view.   Both railroad and telegraph-cable rates are
initiated by the carrier. It is true that a railroad rate
does not have the force of law unless it is filed with the
Commission.   But it is not true that out of the filing of
the rate grows the rule of law by which the terms of this
lawful rate conclude the passenger.   The rule does not
rest upon the fiction of constructive notice.   It flows from
the requirement of equality and uniformity of rates laid
down in § 3 of the Act to Regulate Commerce.   Since any
deviation from the lawful rate would involve either an un-
due preference or an unjust discrimination, a rate law-
fully established must apply equally to all, whether there
is knowledge of it or not.   Congress apparently concluded,
in the light of discrimination theretofore practiced by
railroads among shippers and localities, that in trans-
portation by rail equality could be secured only by pro-
visions involving the utmost definiteness and constant
official supervision.   Accordingly by § 6 it forbade a
carrier of goods from engaging in transportation unless
its rates had been filed with the Commission; and it pro-
hibited, under heavy penalties, departure in any way
from the terms of those rates when filed.   In the case of
telegraph and cable companies Congress appears to have
considered that such stringent provisions were not re-
quired to secure the end in view.   It did not make filing
with the Commission a condition precedent to the exist-
ence of a lawful telegraph and cable rate.   When, there-
fore, the Western Union initiated and established this

reasonable rate, the principle of equality and uniformity laid down in § 3 required that it should have exactly the same force and effect as the rate initiated by a rail carrier and filed according to the provisions of § 6.

It was suggested that the attempted limitation of liability must fail under the rule recently applied in *Union Pacific R. R. Co.* v. *Burke,* 255 U. S. 317; because both the alternative rates offered in the Western Union tariff for cable messages were for limited liability, and because, therefore, no offer was made to the sender of a rate under which the company would assume full liability for all losses suffered through its negligence. It is by no means clear that the rule of the *Burke Case*—established for common carriers of goods—should be applied to telegraph and cable companies. See the *Primrose Case, supra,* p. 14. In any event, it is not applicable here. The Western Union did not, as in the case of telegrams, offer to send cable messages upon a special valuation to be made by the sender and paid for by an extra charge "based on such value equal to one-tenth of one per cent. thereof." But it offered alternative rates for repeated and for unrepeated cable messages. This long-established classification was expressly recognized as just and reasonable for cable as well as for telegraph messages in the amendment made by the Act of June 18, 1910, to § 1 of the Act to Regulate Commerce. The provision in the terms offered by the company is:

"To guard against mistakes or delays the sender of a cable message should order it repeated, that is, telegraphed back to the originating office for comparison. For this, one-quarter of the unrepeated cable message rate is charged in addition. Unless otherwise indicated on its face this is an unrepeated cable message and paid for as such.

". . . this company shall not be liable for mistakes or delays in transmission or delivery . . . of any un-

repeated message; beyond the amount of that portion of the tolls which shall accrue to this company; . . . [nor] of any repeated message, beyond fifty times the extra sum received by this company from the sender for repeating such message over its own lines. . . ."

The repeated rate, offering greater accuracy and greater liability in case of error, was open to anyone who wished to pay the extra amount for extra security. Whether the limitation of liability prescribed for the repeated message would be valid as against a sender who had endeavored, by having the message repeated, to secure the greatest care on the part of the company, we have no occasion to decide, because it is not raised by the facts before us. It is enough to sustain the limitation of liability attached to the unrepeated rate that another special rate was offered for messages of value and importance, and not availed of. The fact that the alternative rate had tied to it a provision which, if tested, might be found to be void, is not material in a case where no effort was made to take advantage of it.

*Reversed.*

MR. JUSTICE PITNEY and MR. JUSTICE CLARKE dissent.