A. C. DUNNING, APPELLEE, v. WESTERN UNION TELEGRAPH COMPANY, APPELLANT.

FILED APRIL 19, 1922. No. 21551.

1. **Commerce:** INTERSTATE COMMERCE: POWER TO REGULATE. Power to regulate interstate rates and the like, as affecting railroads and telegraph companies which are engaged in interstate commerce, has been conferred by congress upon the interstate commerce commission and such control cannot be interfered with by state laws.

Dunning v. Western Union Telegraph Co.

2. **Courts: FEDERAL STATUTES: CONSTRUCTION.** When the supreme court of the United States has construed an act of congress, the meaning placed thereon by that court controls the action of the state courts.

APPEAL from the district court for Polk county: GEORGE F. CORCORAN, JUDGE.  *Reversed, with directions.*

*Francis R. Stark, King, Bittner & Campbell* and *Brogan, Ellick & Raymond,* for appellant.

*Mills, Beebe & Mills,* contra.

Heard before LETTON, DAY and DEAN, JJ., BLACKLEDGE and TEWELL, District Judges.

DEAN, J.

Plaintiff is a buyer and shipper of grain and operates a grain elevator at Shelby, Nebraska. Defendant is a receiver and sender of telegraph messages for hire. August 11, 1917, plaintiff sent an interstate Western Union telegram from Shelby, Nebraska, addressed to "The Andrew McClelland Mercantile, Industrial & Realty Co.," a grain dealer at Pueblo, Colorado, quoting and offering for sale a carload lot of number three oats at a price therein named. Owing to a mistake by defendant's employee, which occurred at its office, in substituting the name of another firm on the telegram of acceptance, for that of the McClelland company which accepted the offer, plaintiff alleged that he suffered damages in the sum of $225 and sued to recover that amount. The case was tried to a jury, and a judgment on the verdict in that sum was rendered, from which defendant has appealed.

Following are the material facts: The telegram containing plaintiff's offer was received at Pueblo and delivered to the McClelland company and on the same day the offer was accepted by that company by wire. But in sending the telegram of acceptance to plaintiff at Shelby the name of "Herman Merc. Co.," also a grain dealer at Pueblo, was substituted at defendant's sending office for that of "The Andrew McClelland Mercantile, Industrial &

Realty Co." A copy of the telegram as forwarded by defendant and received by plaintiff follows: "Pueblo, Colo. 8-11. To A. C. Dunning, Shelby, Nebr. Wire received book one car three white oats price quoted. (Signed) Herman Merc. Co."—so that plaintiff was not at all notified of the acceptance of the offer by the McClelland company. However, plaintiff, having no knowledge of the substitution in name, shipped the car of oats in good faith to the Herman company and wrote them that the shipment had been made. Upon receipt of plaintiff's letter the Herman company, having ordered no oats and having no previous knowledge of the shipment, wired plaintiff that, if the order was booked it should be canceled. It transpired that on the disposition of the shipment to others, about 10 days thereafter, plaintiff sustained a loss of $225 by a drop in the market. Thereupon this action was brought to recover that amount on account of defendant's' alleged negligence in the premises.

It may be here observed that plaintiff's failure to question the receipt of a telegram signed by a party other than the one to whom he had quoted the price of oats is explained by a custom which is said to prevail among grain men and which is not questioned by defendant. The custom in question is that, where a grain dealer receives such a quotation on grain, which he does not wish to buy, he hands it to some other dealer who wants to buy the offered grain at the price quoted and the latter wires an acceptance to the sender of the telegram.

On the ground that the telegram was interstate in character the Western Union Company cites and relies on the federal act of June 18, 1910 (36 U. S. St. at Large, ch. 309, sec. 7, pp. 539, 544, 8 Comp. St. 1916, sec. 8563), and denies liability in the premises. So far as applicable here the act provides:

"That the provisions of this act shall apply to * * * telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one state, territory, or district of the United States, to any other

state, territory, or district of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act. * * * Provided, however, that the provisions of this act shall not apply to the * * * transmission of messages by telephone, telegraph, or cable wholly within one state and not transmitted to or from a foreign country from or to any state or territory as aforesaid. * * * All charges made for any service rendered * *. * for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful; provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages."

The federal act under consideration was construed in *Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co.,* 251 U. S. 27. Chief Justice White in writing the opinion for the court said: "In the first place, as it is apparent on the face of the act of 1910 that it was intended to control telegraph companies by the act to regulate commerce, we think it clear that the act of 1910 was designed to and did subject such companies as to their interstate business to the rule of equality and uniformity of rates which it was manifestly the dominant purpose of the act to regulate commerce to establish, a purpose which would be wholly destroyed if, as held by the court below, the validity of contracts made by telegraph companies as to their interstate commerce business continued to be subjected to the control of divergent and it may be conflicting local laws."

The *Western Union Telegraph Co. v. Esteve Bros. & Co.,* 256 U. S. 566, is a case which was decided June 1, 1921, wherein Mr. Justice Brandeis who wrote the opinion,

among other things, said: "The act of 1910 introduced a
new principle into the legal relations of the telegraph com-
panies with their patrons which dominated and modified
the principles previously governing them. Before the act
the companies had a common-law liability from which they
might or might not extricate themselves according to views
of policy prevailing in the several states. Thereafter, for
all messages sent in interstate or foreign commerce, the
outstanding consideration became that of uniformity and
equality of rates. Uniformity demanded that the rate rep-
resent the whole duty and the whole liability of the com-
pany. It could not be varied by agreement; still less could
it be varied by lack of agreement. The rate became, not
as before a matter of contract by which a legal liability
could be modified, but a matter of law by which a uniform
liability was imposed. Assent to the terms of the rate was
rendered immaterial, because, when the rate is used, dis-
sent is without effect."

On the face of the telegraph blank in evidence here the
following language appears: "Send the following tele-
gram, subject to the terms on back hereof, which are here-
by agreed to." On the reverse side among other provisions
we find this: "In any event the company shall not be
liable for damages for any mistakes or delays in the trans-
mission or delivery, or for the nondelivery, of this tele-
gram, whether caused by the negligence of its servants or
otherwise, beyond the sum of fifty dollars, at which amount
this telegram is hereby valued, unless a greater value is
stated in writing hereon at the time the telegram is of-
fered to the company for transmission, and an additional
sum paid or agreed to be paid based on such value equal to
one-tenth of one per cent. thereof."

It clearly appears that the mistake in affixing the name
or designation, "Herman Merc. Co.," to the telegram by
"The Andrew McClelland Mercantile, Industrial & Realty
Co." to defendant's telegraph office at Pueblo was due to
the negligence of defendant's employee at that office who
received the message over the telephone and handed it to

the telegraph operator for transmission. To account for the mistake in taking the message over the telephone the rule of *idem sonans* has no application. It is obvious that there is almost no similarity of sound in pronouncing the names of the two firms. Certainly there is not enough to create confusion in the mind of an employee who exercised reasonable care. The evidence on this point can hardly be said to be in serious conflict and it amply supports the verdict.

The power to regulate interstate rates and the like, as affecting railroads and telegraph companies which are engaged in interstate commerce, having been conferred by congress upon the interstate commerce commission, the tariff rates of such companies when filed with and approved by the interstate commerce commission then become effective. In the present case the rates in question here were in effect when the facts occurred out of which this action arose. The federal government being supreme in the control of interstate commerce, as held by the supreme court of the United States, the state cannot of course interfere with that control. And it may be added that the act is so far reaching that the receiver of an interstate telegram, as well as the sender, comes within its meaning. *Klotz v. Western Union Telegraph Co.*, 187 Ia. 1355.

Under the law and the terms of the contract which are indorsed on the telegraph blank, and in view of the facts, plaintiff was entitled to a recovery on account of defendant's proved negligence. But defendant's liability on the ground of negligence having been limited to $50, plaintiff cannot recover more on that ground, even though, as the evidence shows, his damage considerably exceeded that sum as found by the jury.

When the supreme court of the United States has construed an act of congress, the meaning placed thereon by that court controls the action of the state courts.

For the reasons stated, the judgment is reversed and the cause remanded, with instructions to enter judgment for

plaintiff in the sum of $50 as of the date of the original judgment.

REVERSED.