24 F.(2d)—36½

## BASILA v. WESTERN UNION TELEGRAPH CO.

District Court, S. D. Florida.    January 31, 1928.

No. 226.

1. Commerce ⚖28—Transfer of money by telegraph from Florida to New York constitutes "interstate commerce."

Transfer of money by telegraph money order from Florida, the point of origin, to New York, constitutes "interstate commerce."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. Commerce ⚖33—Transmission of money by express company from New York to Syria is "foreign commerce."

Transmission of money by express company from New York to Syria constitutes a matter of foreign commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Foreign Commerce.]

3. Commerce ⚖8(7)—Power of state to legislate with reference to interstate commerce of telegraph companies was suspended by federal legislation thereon (Act June 18, 1910 [36 Stat. 539], amending Interstate Commerce Act).

Congress having, by Act June 18, 1910 (36 Stat. 539), amending the Interstate Commerce Act, taken possession of the field of interstate commerce by telegraph, power of state to legislate with reference thereto is suspended.

4. Commerce ⚖8(7)—State statutes relating to attorney's fees have no application in action against telegraph company for failure to deliver money in interstate and foreign commerce (Act June 18, 1910 [36 Stat. 539], amending Interstate Commerce Act).

In action against telegraph company for damages for failure to deliver money in interstate and foreign commerce, state statutes relative to matter of attorney's fees have no application, in view of fact that Congress, by Act June 18, 1910 (36 Stat. 539), amending the Interstate Commerce Act, placed telegraph companies under jurisdiction of Interstate Commerce Commission with respect to interstate and foreign business.

5. Telegraphs and telephones ⚖57—Law holding initial carrier for loss of property held inapplicable to telegraph companies (Carmack Amendment [49 USCA § 20, pars. 11, 12]).

The Carmack Amendment to the Interstate Commerce Act (49 USCA § 20, pars. 11, 12; Comp. St. §§ 8604a, 8604aa), holding initial carrier for loss of property, whether caused by initial carrier or any subsequent common carrier railroad or transportation company, does not apply to telegraph companies.

**6. Carriers** ⊜⇒177(3)—Law holding initial carrier for loss of property held inapplicable to foreign commerce (Carmack Amendment [49 USCA § 20, pars. 11, 12]).

The Carmack Amendment to the Interstate Commerce Act (49 USCA § 20, pars. 11, 12; Comp. St. §§ 8604a, 8604aa), holding initial carrier for loss of property being transported, whether caused by initial carrier or any subsequent common carrier railroad or transportation company, does not apply to foreign commerce, but relates only to property received for transportation from a point in one state to a point in another state.

**7. Carriers** ⊜⇒177(3)—Liability of initial carrier, in absence of statute or contract, is only for default occurring on own lines.

In absence of a statute or contract, liability of initial carrier is only for such default as occurs on its own lines.

**8. Banks and banking** ⊜⇒188½—Contract whereby telegraph company, transmitting money, limited liability as initial carrier, held valid.

Contract whereby telegraph company, transmitting money in interstate and foreign commerce, limited its liability as initial carrier for defaults occurring on its own lines, *held* valid.

**9. Banks and banking** ⊜⇒188½—Telegraph company, limiting liability as initial carrier, held not liable for loss after delivering money to another medium.

Where telegraph company, under contract for transmission of money to foreign country, limited its liability as initial carrier to defaults occurring on its own lines, and thereafter carried out its contract by transmitting money to New York and delivering it to another medium, with orders for its further transmission in foreign commerce, sender had no cause of action against telegraph company for subsequent loss.

At Law. Action by John Basila against the Western Union Telegraph Company. Judgment for defendant.

Julian C. Ryer, of Miami, Fla., for plaintiff.

J. Julien Southerland, of Miami, Fla., for defendant.

CLAYTON, District Judge. This action to recover $5,000 damages, brought in the circuit court of the eleventh judicial circuit of Florida, was removed by the defendant to this court.

The first count of the declaration is for a breach of contract; the other three being the common counts for money had and received. To each count the defendant pleaded the general issue; that the money in question was paid to the defendant under a contract which the defendant had fully performed; and, for a third plea, what is termed the connecting carrier defense. During the trial the plaintiff amended his declaration by inserting his claim for attorney's fee under the Florida statute.

In the stipulation by the parties jury trial was waived, and further, in accordance with the stipulation, I find the facts to be:

That on July 7, 1924, the plaintiff applied to the defendant at its office at Live Oak, Fla., to send the sum of $800 to one Yusuf Basila, at Saida, Syria, and then and there signed the defendant's standard application for such transfer of the money, and paid to the defendant in cash the sum of $800, and also the transmission charges, $16.-49. That the application for this money transfer, which was signed by the plaintiff, contained among the provisions the following: "When the company has no office at destination authorized to pay money, it shall not be liable for any default beyond its own lines, but shall be the agent of the sender, without liability, and without further notice, to contract on the sender's behalf with any other telegraph or cable line, bank, or other medium, for the further transmission and final payment of this order." That on July 7, 1924, defendant transmitted by telegraph from its office at Live Oak, Fla., to its New York office, the money transfer order set out in the plaintiff's application. That the defendant did not have on July 7, 1924, and never has had, an office at Saida, Syria, authorized to pay money, and on the 7th day of July, 1924, the defendant at New York, N. Y., employed the American Express Company to transmit the said sum of $800 from New York, N. Y., to Saida, Syria, and there to pay it to the party designated by the plaintiff in the application for the money transfer, namely Yusuf Basila. The sum of $800 was not paid by the express company to the identical Yusuf Basila to whom the plaintiff intended it to be paid.

[1-3] The evidence shows that, as the money order in question was filed at Live Oak, Fla., destined to Saida, Syria, and was handled by the defendant from the point of origin to New York, N. Y., it was interstate commerce, and that it was delivered by the defendant to the American Express Company at New York, N. Y., for transmission to Saida, Syria, and that such was a matter of foreign commerce. By the Act of June 18, 1910 (36 Stat. 539), amending the Interstate Commerce Act, telegraph companies were placed under the jurisdiction of the Interstate Commerce Commission with respect to their interstate and foreign business. As it was aptly said in the case of Gardner v. Western Union Telegraph Co. (C. C. A.) 231 F. 405:

"Congress has take.. possession of the field of interstate commerce by telegraph, and it results that the power of the states to legislate with reference thereto has been suspended."

Furthermore, Mr. Chief Justice White, speaking for the court, said, in the Western Union Tel. Co. v. Boegli, 251 U. S. 315, 40 S. Ct. 167, 64 L. Ed. 281:

"The proposition that the act of 1910 must be narrowly construed, so as to preserve the reserved power of the state over the subject in hand, although it is admitted that that power is in its nature federal, and may be exercised by the state only because of nonaction by Congress, is obviously too conflicting and unsound to require further notice. We therefore consider the statute in the light of its text, and, if there be ambiguity, of its context, in order to give effect to the intent of Congress as manifested in its enactment.

"As the result of doing so, we are of opinion that the provisions of the statute bringing telegraph companies under the act to regulate commerce as well as placing them under the administrative control of the Interstate Commerce Commission so clearly establish the purpose of Congress to subject such companies to a uniform national rule as to cause it to be certain that there was no room thereafter for the exercise by the several states of power to regulate, by penalizing the negligent failure to deliver promptly an interstate telegram, and that the court below erred, therefore, in imposing the penalty fixed by the state statute.

"We do not pursue the subject further, since the effect of the act of 1910 in taking possession of the field was recently determined in exact accordance with the conclusion we have just stated. Postal Telegraph Cable Co. v. Warren-Godwin Lumber Co., 251 U. S. 27, 40 S. Ct. 69, 64 L. Ed. 118. That case, indeed, was concerned only with the operation, after the passage of the act of 1910, of a state statute rendering illegal a clause of a contract for sending an interstate telegram limiting the amount of recovery under the conditions stated, in case of an unrepeated message; but the ruling that the effect of the act of 1910 was to exclude the possibility thereafter of applying the state law was rested, not alone upon the special provisions of the act of 1910 relating to unrepeated messages, but upon the necessary effect of the general provisions of that act, bringing telegraph companies under the control of the interstate commerce act. The contention as to the continuance of state

power here made is therefore adversely foreclosed."

[4] Manifestly the statutes of Florida touching the matter of attorney's fees can have no application here. I think further comment on this proposition unnecessary.

[5, 6] Act June 29, 1906 (34 Stat. 595 [49 USCA § 20, pars. 11, 12; Comp. St. §§ 8604a, 8604aa]), called the Carmack Amendment to the Interstate Commerce Act, does not apply to telegraph companies. It is confined in its scope to "any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state, * * *" and holds the initial carrier for loss of property being transported, whether caused by the initial carrier or any subsequent common carrier, railroad, or transportation company. It is settled that the Carmack Amendment does not apply to telegraph companies. Merriweather v. Western Union Tel. Co., 183 Ky. 710, 210 S. W. 190; Western Union Tel. Co. v. Compton, 114 Ark. 193, 169 S. W. 946. And it is also well settled that the Carmack Amendment does not apply to foreign commerce, but relates only to property received for transportation from a point in one state to a point in another state. Houston E. & W. R. Co. v. Inman, 63 Tex. Civ. App. 556, 134 S. W. 275.

The defendant has pleaded what is known as the connecting carrier defense; that is to say, that the defendant having performed its full contract with the plaintiff, and having correctly transmitted the money order over defendant's lines, it having been necessary for the defendant to employ a connecting carrier for the further transmission and payment of the money order, there is no liability on the defendant, even at common law, in view of the fact that no default occurred on the defendant's lines. It was not shown, nor indeed has it been alleged, that the defendant was guilty of negligence in the selection of the agent to make further transmission of the money order beyond its terminus.

[7] It is a familiar rule in the federal courts that, in the absence of a statute or contract, the liability of the initial carrier is for such default only as occurs on its own lines. "In most of the states, and in the federal courts, the English doctrine has been repudiated. Briefly stated, the rule formulated by the decisions of these courts is that, in the absence of any contract, usage, or statute to the contrary, or of any partnership agreement between connecting carriers or joint

contract for transportation, the liability of the initial carrier notwithstanding the fact that the goods are marked to a point beyond its line, terminates when it transports the goods to the end of its line and delivers them to a connecting carrier to be transported to their destination." 10 C. J. p. 517, § 842.

And the same rule applies to telegraph companies. "In determining the duties and liabilities of connecting lines of telegraph companies, the courts are governed to a great extent by the principles applicable in the case of successive carriers of goods. Where a telegraph company receives a message to be transmitted to a point beyond its own line and on a connecting line, it undertakes for care and attention in transmitting it over its own line, and for its prompt delivery to a competent and responsible company for further transmission. When so delivered, its liability terminates, and that of the receiving company begins." 26 R. C. L. p. 558, § 63.

[8] The pertinent provision of the contract between the plaintiff and defendant has been set out hereinabove. That contracts of this kind, limiting the liability of the initial carrier for defaults occurring on defendant's own lines, are valid, is settled law.

"In the absence of statute providing otherwise, the initial carrier may by special contract limit its liability to loss or injury occurring on its own line. This is necessarily so because the obligation of the carrier to transport goods beyond the terminus of its own line is purely a matter of contract and not of legal duty. Contracts of this character are forbidden neither by public policy nor by constitutional or statutory provisions which prohibit a carrier from limiting its common-law liability, since at common law the initial carrier is not liable for loss or injury on a connecting line. Such a limitation does not relieve the carrier from its common-law liability safely to carry and deliver to the connecting carrier." 10 C. J. p. 529, § 868.

Again the rule is stated in 26 R. C. L. p. 576, § 79, as follows: "A telegraph company receiving a message for transmission over its own line and which becomes the agent of the sender to forward it over the line of another company may, by special contract with the sender, limit its liability to defaults occurring on its own line, and protect itself against any loss occasioned by the negligence of the connecting company."

The rule is also dealt with in 37 Cyc. p. 1692, in these words: "A stipulation that the telegraph company shall be the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination is reasonable and valid, and protects the initial company against liability for negligence on the part of any other company to which the message is necessarily transferred; but such a stipulation does not protect the original transmitting company against its own negligence prior to the transfer of the message to the connecting company, or affect the liability of the latter company for its own negligence after the message has been transferred to it."

A question similar to the one in this case was involved in Katz v. Western Union Tel. Co., in the Appellate Term, First Department, Supreme Court of New York, decided in November, 1922, and reported in 119 Misc. Rep. 489, 196 N. Y. S. 556. The following is quoted from the opinion of the court in that case:

"Plaintiff delivered money to the defendant telegraph company for payment to a party in Rotterdam. The telegraph company had no agent in Rotterdam, and therefore turned the money over to the defendant bank for transmission. This was done in conformity with the prescribed tariff or conditions of defendant for the handling of money transfers on file with the Interstate Commerce Commission in Washington. Needless to say that, under the federal act of June 18, 1910 (U. S. Comp. St. Sec. 8563), federal law governs the interstate and foreign commerce of telegraph companies, and that tariffs filed with and approved by the Interstate Commerce Commission are upon principles firmly established the sole legal conditions upon which the business may be done. Western Union Tel. Co. v. Esteve Bros., 256 U. S. 566, 41 S. Ct. 584, 65 L. Ed. 1094; Boston & Maine Railroad v. Hooker, 233 U. S. 97, 34 S. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593. Upon these considerations it seems to follow that the defendant telegraph company, having acted strictly in conformity with its tariff and working rules approved by the Interstate Commerce Commission, became in literal accordance with these terms the agent of the sender to contract with the bank in his behalf, and that, the money not having been transmitted through the negligence of the defendant bank, the latter alone is liable."

The same question was involved in the case of Lehue v. Western Union Telegraph Co., 175 N. C. 561, 96 S. E. 29, decided by the Supreme Court of North Carolina in May, 1918, and also in the case of Western

Union Tel. Co. v. Bowen, 203 Ala. 409, 83 So. 283, decided by the Supreme Court of Alabama in October, 1919. The following is quoted from the latter case:

"Construing the same stipulation, it was said in Lehue v. W. U. Tel. Co., 175 N. C. 561, 563, 96 S. E. 29, 30: 'The stipulation printed in the money order application signed by the husband contains a distinct provision that, if the place at which the money was to be paid was not a money order office, then the company should be allowed to employ a bank to make the ultimate payment, and that the company would not be liable for the acts or neglect of the bank. The bank was made the agent of the sender for the further transmission of the money beyond the defendant's money order offices.' That a telegraph company may validly stipulate, in respect of this character of service, upon the condition and as the quoted paragraph provided, is not a matter of doubt, the stipulation being reasonable. Lehue v. W. U. Tel. Co., supra."

There was a similar holding in the case of Western Union Tel. Co. v. Sisson, 155 Ky. 624, 160 S. W. 168.

The provision in the contract between the plaintiff and the defendant that the defendant would not be liable for any default beyond its own lines, but would be the agent of the sender, without liability, to contract on the sender's behalf with another medium for the further transmission and payment of the money order in question, was a part of the defendant's tariffs on file with the Interstate Commerce Commission, was the standard and uniform contract between the defendant and its patrons, and was an inherent part of the rate schedule of the defendant. It was a precise delineation of the defendant's liability in this case. The Supreme Court of the United States, in the case of Western Union v. Esteve Bros., 256 U. S. 566, 41 S. Ct. 584, 65 L. Ed. 1094, said:

"Act June 18, 1910, c. 309, § 7, 36 Stat. 539, 544 (Comp. St. § 8563), broadened the scope of the Act to Regulate Commerce to include 'telegraph, telephone and cable companies (whether wire or wireless) engaged in sending messages from (a) state * * * to any foreign country.' And whatever may have been the legal incidents of transmitting the message from Barcelona to Havre under Spanish and French law, the Western Union, in sending the message over its own lines from Havre to New Orleans, was governed by the provisions of that Act. Galveston, H. & S. A. Ry. Co. v. Woodbury, 254 U. S. 357, 41 S. Ct. 114, 65 L. Ed. 301. * * * But

the rate, long before established, then formally adopted and filed, was thereafter the only lawful rate for an unrepeated message, and the limitation of liability became the lawful condition upon which it was sent. Postal Tel-Cable Co. v. Warren-Godwin, 251 U. S. 27, 30, 40 S. Ct. 69, 64 L. Ed. 118; Clay County Produce Co. v. Western Union Telegraph Co., 44 Com'n R. Interst. Com. 670, 674.

"The lawful rate having been established, the company was by the provisions of section 3 of the Act to Regulate Commerce [49 USCA § 3; Comp. St. § 8565] prohibited from granting to any one an undue preference or advantage over the public generally. For, as stated in Postal Tel. Cable Co. v. Warren-Godwin Co., supra, 251 U. S. 30, 40 S. Ct. 70, 64 L. Ed. 118, the 'act of 1910 was designed to and did subject such companies as to their interstate business to the rule of equality and uniformity of rates.' If the general public upon paying the rate for an unrepeated message accepted substantially the risk of error involved in transmitting the message, the company could not, without granting an undue preference or advantage extend different treatment to the plaintiff here. The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.

"The act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect. This principle was established in cases involving the limitation upon a carrier's liability for baggage by Boston & Maine Railroad v. Hooker, 233 U. S. 97, 34 S. Ct. 526, 58 L. Ed. 868,

L. R. A. 1915B, 450, Ann. Cas. 1915B, 593, and Galveston, H. & S. A. Ry. Co. v. Woodbury, 254 U. S. 357, 41 S. Ct. 114, 65 L. Ed. 301, decided by this court December 13, 1920. In the former case it was said: 'If the charges filed were unreasonable, the only attack which could be made upon such regulation (limiting liability) would be by proceedings contesting their reasonableness before the Interstate Commerce Commission. While they were in force they were equally binding upon the railroad company and all passengers whose baggage was transported by carriers in interstate commerce.' So here the limitation of liability attached to the unrepeated cable rate is binding upon all who send messages to or from foreign countries until it is set aside as unreasonable by the Commission."

[9] As the evidence in this case establishes that the contract between the plaintiff and the defendant limited the liability of the defendant to defaults occurring on its own line, and this contract is valid and binding upon the plaintiff, and that no default occurred upon the line of the defendant, but that the defendant did its full duty to the plaintiff and fully performed and carried out its contract with the plaintiff by transmitting the money in question to New York, N. Y., and there delivering it to another medium, the American Express Company, with orders for its further transmission and payment to Yusuf Basila, Saida, Syria; therefore it is clear that the plaintiff has no cause of action against the defendant.

Judgment must be entered accordingly.