William C. Hecht, Jr., J.
Defendant is a motor common carrier of household goods. On November 8, 1962, plaintiff delivered to defendant a section of a link simulator, to be transported from its plant in Binghamton, New York, to Nashville, Tennessee. The shipment was damaged in transit. Plaintiff claims damages of $88,004; defendant contends that the recovery-should be limited to $3,168. Both sides move for summary judgment.
•Since the shipment moved in interstate commerce, the Federal statute controls. Subdivision (11) of section 20 of title 49 of the United States Code (the second Cummings amendment) declares unlawful any limitation of liability in a carrier’s bill of lading, provided, however, that such prohibition shall not apply “ to property * * * received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released * * * and any tariff schedule which may be filed with the Commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the Commission is empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation.”
Acting under the foregoing authority, the Interstate Commerce Commission issued its Released Rates Order No. MC-2B on April 21, 1953. This authorized motor common carriers of household goods to establish and file tariffs specifying “ released rates ”, “ said rates and charges to be applicable only when the value declared by the shipper in writing or agreed upon in writing as the released value of the property is as follows.” Then follows a base rate applicable to shipments released to value not exceeding 30 cents per pound per article; 110% of the base rate applicable to shipments released to value between 30 cents and 75 cents per pound per article; and *588 120% of the base rate applicable to shipments released to value over 75 cents but not exceeding $1.50 per pound per article.
Defendant’s tariff specified base rates in cents per 100 pounds on a mileage basis, and provided conversion tables computing 110% and 120% of the base rate. The conversion table also contained the following statement: “Excess Declared Value Rates.” “ Shipper may declare an excess value on specific articles at a rate of two percent of total excess value declared. Articles on which the shipper declares a value of more than $10,000 will not be accepted.”
Rule 3 of the tariff provides:
“ (a) Shippers are required to state specifically, in writing, the agreed or declared value of the property. (See Conversion Tables herein.)
“ (b) Valuations shall be declared in accordance with Interstate Commerce Commission Released Rates order MC-No. 2B, of April 21, 1963, and stated in cents or dollars and cents per pound per article. (See Conversion Tables herein.)
“ (c) If shipper declines to declare the value or agree to a released value in writing, the shipment can not be accepted.
“ (d) * * * such agreed and declared value must be entered on Bill of Lading in the following form:
‘ ‘ THE AGREED OR DECLARED VALUE OF THE PROPERTY IS HEREBY SPECIFICALLY STATED BY THE SHIPPER TO BE NOT EXCEEDING $- PER POUND PER ARTICLE.”
In January, 1962, defendant sent a written quotation to plaintiff, saying: “ The mileage from Binghamton to Sewart Air Firce Base [in Nashville] is 905 miles at a rate of $6.10 per cwt. (Household Goods Carriers’ Bureau Tariff #80-B, Section V). Estimated weight of 61,400 pounds at 6.10 cwt. would be $3,745.40.” The quoted rate of $6.10 was the base rate.
Plaintiff was not informed that such rate applied only to a released value of 30 cents per pound per article; that the rate for a released value of 75 cents per pound would be $6.71 per cwt. (hundredweight), and for a released value of $1.50 per pound would be $7.32 per cwt. Nor was plaintiff informed as to the provision regarding “ excess declared value rates ”. The letter did refer to the applicable tariff, which was available for public inspection.
The shpiment in question moved on November 8, 1962, on defendant’s bill of lading numbered B48988. This bill of lading did not fill in the blanks designed to show the tariff number and section on which the rates were based. It did not inform the shipper that the carrier’s charge was based on the value of the *589 property, which must be declared by the shipper. It did not contain the form required by subdivision (d) of rule 3 of defendant’s tariff, nor that specified in the uniform bill of lading on page 19 of defendant’s tariff. The legend on the bill reads as follows:
VALUATION
Shippers are required to declare in writing the released value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding 30 cents per pound, per article.
(Shipper or Agent)
The shipper hereby declares valuation in excess of the limit set forth herein on the following specific articles:
article (If None, write “None”) Excess Valuation
The foregoing valuation declaration was not signed by the shipper or agent. Three other shipments of plaintiff were moved by defendant to the same destination on similar bills of lading on November 5, 6 and 9. The former two stated that the rates were based on defendant’s tariff 96B (the tariff already quoted), and section 5 thereof (the base rate tariff). None of them made reference to section 7 of the same tariff, which stated the alternative rates applicable to higher released valuations. In none of them was the valuation declaration signed by the shipper.
The only other shipments made by plaintiff via defendant carrier were four in March, 1962. The same form of bill of lading was used. None of these bills specified the tariff on which the rates were based. In only one of them did the shipper sign the statement that61 the agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding 30 cents per pound, per article.”
The instant shipment, as well as the three other November shipments and three of the four earlier March shipments, were all accepted and transported by defendant in direct violation of rule 3 of the tariff, providing that ‘1 Shippers are required to state specifically, in writing, the agreed or declared value of the property ” (subd. [a]); and that “ If a shipper declines to declare the value or agree to a released value in writing, the shipment can not be accepted ” (subd. [c]).
The one March bill of lading signed by the shipper does not help defendant, because the form of the declaration does not conform to the form prescribed in the tariff. The form requires the amount of cents per pound to be left blank, in order forcibly to call the shipper’s attention to the fact that he has a choice *590 of valuation. This purpose is frustrated when the minimum valuation is printed in the form.
Defendant’s motion for summary judgment is denied. It cannot prevail on the basis of its bill of lading, because that instrument did not put the shipper on notice of the alternative rates available to it on a declaration of higher released value, and because the shipper did not agree in writing to a limitation of 30 cents per pound per article for the November shipment. It cannot prevail on the basis of its tariff because it failed to conform to subdivisions (a), (c) and (d) of rule 3 and to the uniform bill of lading.
The history and purpose of common carrier bills of lading are traced in In the Matter of Bills of Lading (52 I. C. C. 671). “ In the celebrated case of Coggs v. Bernard, 2 Lord Raymond, 909; 1 Smith’s Leading Cases, 369, Lord Holt, in quaint language, states the common-law liability of carriers as of that time to be that if ‘ a delivery to carry or otherwise manage, * * * ’ is made ‘ to one that exercises a public employment, * * * and he is to have a reward, he is bound to answer for the goods at all events. * * * The law charges this person thus intrusted to carry goods, against all events, but acts of G-od, and of the enemies of the King ’ ” (p. 679).
At first the English courts recognized the rights of carriers to limit their common-law liability by publishing and posting in public places notices that they would not assume liability in excess of specified values for goods unless the owner should pay a higher rate in consideration thereof.
“ The custom, sanctioned by law, which thus grew up in England, was productive of so many evils that in 1854 the Parliament intervened and enacted the railway and canal traffic act. After the enactment of the statute common carriers in England could limit their common-law liability only by a contract with the shipper. In this country, however, the rule was early established that a limitation of the carrier’s liability could be effected only by the establishment of a contractual relationship between the carrier and shipper and that a notice of limitation of liability such as was at one time recognized by the English courts was ineffectual and could not be relied upon as a defense in an action for recovery on account of loss or damage to the goods unless the shipper first had notice of the terms and assented to them. Once assented to by the shipper a contract was assumed to be created that would be binding upon him. The form of such an assent is now commonly secured by the giving and accepting of a written bill of lading, assent on the part of *591 the shipper being presumed even though, as is unquestionably the fact, he seldom reads and is, perhaps, actually ignorant of the conditions (p. 680).
* * #
“ It is sufficient if the shipper accepts the carrier’s bill of lading without himself signing it. It becomes binding upon him by his acceptance, he being presumed to know and accept the conditions of the written bill of lading ” (p. 681).
Consideration for the carrier’s limitation of liability “ is usually found in the agreement by the carrier to apply a lower or, as it is expressed in the governing freight classifications in effect in this country, ‘ reduced ’ rate; and this is a sufficient consideration” (p. 681).
However, the efficacy of the limitation of liability in the bill of lading depends on an explicit statement that the liability is limited, and an indication of the alternative rates available to the shipper for the higher valuations. This is especially true since the shipper seldom reads the bill of lading and is bound by it even without signing it.
In the first Supreme Court decision applying the limitation of liability (Hart v. Pennsylvania R. R. Co., 112 N. S. 331), the bill of lading was captioned ‘ ‘ Limited Liability Live-Stock Contract ” (p. 332). The first paragraph thereof was that plaintiff was to pay the rate expressed “ on the condition that the carrier assumes a liability on the stock to the extent of the following agreed valuation: ” (ibid.).
The court said, per Blatchfobd, J. (p. 343): “ The distinct ground of our decision in the case at bar is, that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a duo proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations.”
In an early New York case (Greenwald v. Barrett, 199 N. Y. 170, 174), the receipt of defendant express company contained the following language: “ In consideration of the rate charged for carrying said property, which is regulated by the value thereof and is based upon a valuation of not exceeding fifty dollars unless a greater value is declared, the shipper agrees that the value of said property is not more than fifty dollars, *592 unless a greater value is stated herein, and that the Company shall not be liable in any event for more than the value so stated, nor for more than fifty dollars if no value is stated herein
This receipt ‘1 was taken from a book of blank receipts which plaintiffs had been in the habit of using at their place of business for about three months before this shipment. The entry on the receipt relating to this shipment was filled out by the plaintiffs’ shipping clerk and the receipt was then offered with the package to the driver of the express company who signed and left it with the plaintiffs and took the package away” (ibid.).
The court said, per Willard Bartlett, J. (pp. 177-178): “ In order to regulate its charges to its customers with reference to the value of the property transported, a common carrier may demand of the shipper a declaration of such value, or may agree with him that in default of a statement the value shall be deemed a given amount. This agreement may be direct and express or it may arise indirectly out of the acceptance by the shipper of a receipt from the carrier in which it is stated that the value is to be considered a sum specified if no other has been given by the shipper. Such was the character of the receipt given by the representative of the express company to the plaintiffs in the present case. They had employed the same form of receipt in shipping goods by the Adams Express Company for a period of six years and must be charged with a knowledge of its contents in the absence of any proof whatever that they were not acquainted therewith. There was a booh of blank receipts in their custody and they made the entries in the blanks themselves and completely prepared the receipts for signature by the express company’s driver when he called for and took the goods. The contract of agreed valuation being one which the parties could lawfully make, the proof here required a finding that it had been made, and this fixed the measure of the plaintiff’s damages at $50 and no more ”. (Italics supplied.)
In Adams Express Co. v. Croninger (226 U. S. 491) the receipt was in the same form as in Greemvald (supra). The court said, per Lurtoe", J. (pp. 508-509): “ That no inquiry was made as to the actual value is not vital to the fairness of the agreement in the case. The receipt which was accepted showed that the charge made was based upon a valuation of fifty dollars unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission. That presumption is strengthened by the fact that across the top of this bill of lading there was this .statement in bold type, ‘ This Company’s charge is based upon *593 the value of the property, which must be declared by the shipper’”. (Italics supplied.)
The court said further (pp. 509-510):
‘ ‘ It has therefore become an established rule of the common law as declared by this court in many cases that such a carrier may by a fair, open, just and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk [citing cases].
* * *
“ Neither is it conformable to plain principles of justice that a shipper may understate the value of his property for the purpose of reducing the rate, and then recover a larger value in case of loss. Nor does a limitation based upon an agreed value for the purpose of adjusting the rate conflict with any sound principle of public policy.”
In the case at bar, as already noted, the valuation declaration is printed in small type in an inconspicuous part of the bill. The declaration departs in a substantial respect from the form prescribed by the tariff for the very purpose of giving the shipper notice of his rights and obligations. The declaration was not signed, in the absence of which signature the shipment should not have been accepted. The shipper’s signature on the lower right-hand corner of the bill of lading is not a substitute for the required signature on the left-hand margin under the valuation declaration.
Under these circumstances, the bill of lading does not evidence “a fair, open, just and reasonable agreement” limiting the carrier’s liability. Neither does it form the basis for an inference that the shipper understated the value of his property for the purpose of reducing the rate.
The same factors distinguish the other cases relied on by defendant, wherein the carrier’s limitation of liability was upheld on the basis of the bill of lading. In those cases, either the shipper actually signed the valuation declaration with its limitation of liability and availability of an alternative rate or the fact of limitation and of alternative rates was clearly and forcibly set forth in the document. (Kansas Southern Ry. v. Carl, 227 U. S. 639, 640-642; Missouri, Kan. & Tex. Ry. v. Harriman, 227 U. S. 657, 665-666; Great Northern Ry. v. O’Connor, 232 U. S. 508, 509-510; American Express Co. v. United States Horse Shoe Co., 244 U. S. 58, 60 -62; Boston, & Maine R. R. v. Piper, 246 U. S. 439, 442-443.)
*594 The controlling principle is aptly stated by Clarke, J., in Union Pacific R. R. Co. v. Burke (255 U. S, 317, 321, affg. 226 N. Y. 534), where he says: “In many cases, from the decision in Hart v. Pennsylvania R. R. Co., 112 U. S. 331, decided in 1884, to Boston & Maine R. R. v. Piper, 246 U. S. 439, decided in 1918, it has been declared to be the settled federal law that if a common carrier gives to a shipper the choice of two rates, the lower of them conditioned upon his agreeing to a stipulated valuation of his property in case of loss, even by the carrier’s negligence, if the shipper makes such a choice, under standingly and freely, and names his valuation, he cannot thereafter recover more than the value which he thus places upon his property”. (Italics supplied.)
Coming now to defendant’s tariff: Where a tariff provides alternative rates depending on valuation, a shipper who pays the minmnm rate is limited to the valuation applicable to that rate.
“ Where there are two published rates, based upon difference in value, the legal rate automatically attaches itself to the declared or agreed value ”. (Kansas Southern Ry. v. Carl, 227 U. S., 637, 652-653, supra.)
‘ ‘ When the carrier graduates its rates by value and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate ”. (Missouri, Kan. & Tex. Ry. v. Harriman, 227 U. S. 657, 671, supra.)
In the foregoing and other cases relying on tariff provisions, the bill of lading was effective to limit liability. It has also been held that the tariff provision alone is sufficient to limit liability, because of the public policy in avoiding discrimination by permitting a shipper to obtain unlimited liability without paying the rate appleable thereto. (See opinion of Brandeis, J., in Galveston etc. Ry. Co. v. Woodbury, 254 U. S. 357; and in Western Union Tel. Co. v. Esteve Bros. & Co., 256 U. S. 566; and of Holmes, J., in American Ry. Express Co. v. Daniel, 269 U. S. 40.)
But in those cases the tariff requirements were scrupulously adhered to. The carrier cannot rely on the implied contract based on its tariff provisions unless it performs its part of the bargain by strict compliance with those provisions. That has not been done here.
No excuse has been offered for defendant’s failure in this respect. The carrier certainly knew that these link simulators were items of substantial value. The original quotation rate *595 of $6.10 per cwt. should have mentioned that this limited its liability to 30 cents per pound per article, and should have named the alternative rates for higher valuations. The carrier, being experienced in the business, knew that the shipment cannot be accepted “ If shipper declines to declare the value or agree to a released value in writing ”. It knew that it could refuse to accept articles on which the shipper declares a value of more than $10,000.
Bach of the eight shipments in question involved freight charges of over $1,000, and were known to be valuable. These were not shipments of trunks and the like where the freight charges were small. If the carrier expected to charge the shipper with notice of the contents of the tariff, it should either have sent the shipper a copy thereof, or directed its attention to the important item regarding valuation.
Plaintiff paid without protest bills computed at the minimum rate. This is of no significance unless it is shown that plaintiff had knowledge, from the bill of lading or the tariff, that it was paying a rate based on limited liability. Of course, if plaintiff is permitted recovery on the basis of unlimited liability, it will be required to pay, on all eight shipments, the rate applicable to that valuation as set forth in the conversion table in the tariff, including the 2% on the value in excess of $1.50 per pound per article.
Defendant places great reliance on American Ry. Express Co. v. Lindenburg (260 U. S. 584). But in that case the receipt was substantially similar to the express receipt used in Greenwald and in Croninger (supra). While the receipt was not in the precise words of the receipt authorized by the commission in the filed tariff, it was substantially in accordance therewith.
The court said, per Sutherland, J. (pp. 590-592) :
“ Neither the statute nor the order of the Commission requires the signature of the shipper. The pertinent words of the statute are. í * * * rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value * * * ’ It is not to be supposed that the Commission would attempt to add anything to the substantive requirements of the statute, and its order does not purport to do so; but the form of receipt which the express companies were authorized to adopt contains a recital to the effect that as evidence of the shipper’s agreement to the printed conditions he ‘ accepts and signs this receipt, ’ and a blank space is provided for his signature. Naturally, such signature would be desirable as constituting the most satisfactory evidence of the shipper’s agreement, but it is not made a prerequisite without which no agreement will *596 result, and a subsequent report of the Commission on the subject of bills of lading is persuasive evidence that there was no such intention. In the Matter of Bills of Lading, 52 I. C. C. 671, 681, where it is said:
“ ‘ It is sufficient if the shipper accepts the carrier’s bill of lading without himself signing it. It becomes binding upon him by his acceptance, he being presumed to know and accept the conditions of the written bill of lading.’
“ The respondent, 'by receiving and acting upon the receipt, although signed only by the petitioner, assented to its terms and the same thereby became the written agreement of the parties. * * * In the absence of a statutory requirement, signing by the respondent was not essential. * * * His signature, to be sure, would have brought into existence additional evidence of the agreement but it was not necessary to give it effect. * * * And his knowledge of its contents will be presumed. * * * 1 The receipt which was accepted showed that the charge made was based upon a valuation of fifty dollars unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission.’ Adams Express Co. v. Croninger, 226 U. S. 491, 508-509, 510. Having accepted the benefit of the lower rate dependent upon the specified valuation, the respondent is estopped from asserting a higher value. To allow him to do so would be to violate the plainest principles of fair dealing” (citations omitted).
That case is not controlling here, for the reasons already stated. The instant bill of lading does not clearly indicate the limitation of liability, and the availability of alternate rates for a higher valuation. And the bill of lading involves a substantial departure from the tariff requirements. (Cf. Caten v. Salt City Movers & Stor. Co., 149 F. 2d 428.)
The fact that plaintiff carries insurance is of no consequence. If the carrier is liable, it cannot shift that liability to the shipper’s insurer. (New York & Honduras Rosario Min. Co. v. Riddle Airlines, 3 A D 2d 457, 463-464.)
Plaintiff’s motion for summary judgment is also denied.
Plaintiff would be barred by the provisions of the tariff if it had actual notice thereof, even if defendant did not conform strictly to the terms of rule 3 and of the uniform bill of lading. The purpose of those provisions is to put the shipper on notice of the limitation of liability and the alternative rates; that purpose is served if the carrier can show that the shipper did have knowledge. In that event, the principles set forth in the fore *597 going cases establish that it is estopped from claiming more than the released value applicable to the rate actually paid.
On deposition, plaintiff’s witnesses denied having any knowledge of the tariff. However, defendant is not precluded from cross-examining them before the trial court in its endeavor to prove such knowledge on plaintiff’s part. Moreover, plaintiff’s shipping supervisor did sign the valuation release on bill of lading No. 48,684, covering a shipment on March 9,. 1962. This may be some evidence of plaintiff’s knowledge of the existence of the provision limiting liability, and of the alternative rates available.