**PROFESSIONAL ANSWERING SERVICE, INC., Appellant,**

v.

**CHESAPEAKE AND POTOMAC TELEPHONE CO., Appellee.**

No. 87–1210.

District of Columbia Court of Appeals.

Argued Nov. 3, 1988.
Reargued May 1, 1989.
Decided Oct. 11, 1989.

---

Dale A. Cooter, with whom Nicholas H. Hantzes, Washington, D.C., was on the brief, for appellant.

Frederick B. Abramson, with whom Judy B. Chase, Lee A. Satterfield, Washington, D.C., and F. Joseph Feely, III were on the brief, for appellee.

Howard C. Davenport, Gen. Counsel, with whom Mary J. Sisak and Thomas J. Moorman, Staff Counsel, were on the brief for amicus curiae, The Public Service Com'n of the District of Columbia.

Before ROGERS, Chief Judge, and FERREN and BELSON, Associate Judges.

ROGERS, Chief Judge:

The principal issue in this appeal from the grant of summary judgment is whether, prior to the statutory amendments in 1984, an exculpatory tariff limiting the liability of the Chesapeake & Potomac Telephone Company (C & P) for negligence to the amount of a customer's monthly bills may be approved by the District of Columbia Public Service Commission (PSC) pursuant to the 10 day letter of acceptance procedure of D.C.Code § 43–527 (1981) or must be approved pursuant to the notice and hearing requirements of D.C.Code § 43–601 (1981). We must further decide whether the trial judge erred in finding that the PSC had substantively approved the exculpatory tariff on which C & P relies. Also before us is the issue of whether such a tariff limits C & P's liability for gross negligence. The other issues are related to the trial court rulings on these principal issues.

Appellant, Professional Answering Service, Inc. (PASI), sued appellee, Chesapeake & Potomac Telephone Co., for breach of contract, negligence, gross negligence, and fraudulent misrepresentation. PASI sought to recover damages for installation of a defective telephone system, the provision of inefficient and ineffective telephone service, and failure properly to repair and maintain PASI's telephone system and service. C & P defended on the ground that its liability was limited to the amount of the customer's telephone bill under the terms of an explanatory tariff, Section 1.E.1 of Tariff No. 201, which was included in a 1973 repagination filed and approved pursuant to the 10 day letter of acceptance procedure of D.C.Code § 43–527 (1981).[1]

---

1. D.C.Code § 43–527 (1981) provides:
   No change shall be made in any schedule, including schedules of joint rates, except upon 10 days notice to the Commission, and all such changes shall be plainly indicated upon existing schedules, or by filing new schedules in lieu thereof 10 days prior to the time the same are to take effect: Provided, that the Commission, upon application of any public

PASI responded that the 1973 repagination did not constitute substantive approval of the exculpatory tariff by the District of Columbia Public Service Commission and that the PSC was required, pursuant to D.C.Code § 43–601(c) & (d) (1981),[2] to give notice and hold a hearing before approving the exculpatory tariff. The motions judge (Judge Webber) initially disagreed, and granted partial summary judgment for C & P, but upon reconsideration vacated his order, ruling that while the letter of acceptance procedure governed the tariff, there was a factual dispute whether the PSC had approved it. Based on the pretrial discovery, the trial judge (Judge Wolf) granted summary judgment for C & P on the approval issue, and thereafter entered judgment for PASI in the amount stipulated by the parties, $57,163.53.

Following oral argument on appeal, this court requested the PSC to respond to a series of questions regarding its procedure for approval of the exculpatory tariff and the underlying public policy limiting C & P's liability for negligence and gross negligence. PSC filed a brief stating that tariffs are approved in either of two ways, as part of a rate proceeding or outside of the rate proceeding, and that at the time the 1973 repagination was considered, the PSC interpreted the statute to permit PSC approval of non-rate proceeding partial tariff revisions by the filing and letter of acceptance procedure. Because C & P in 1973 only requested a repagination, PSC's approval of it did not involve substantive approval of the tariff, however; the substantive approval of the exculpatory tariff had occurred, according to the PSC, on October 10, 1967.

We hold that the PSC interpretation of the statute regarding approval procedures for tariffs is reasonable. Thus, if the tariff was properly approved, it limits C & P's liability for negligence. However, we hold that it was error to grant summary judgment since the nature of the 1967 tariff changes is unknown and evidence of PSC approval of a 1973 repagination of tariff pages did not constitute proof that the PSC had substantively approved the tariff. We also hold that the tariff shields C & P against damages for gross negligence. Accordingly, we reverse the orders of September 9, 1986, May 4, 1987, and July 17, 1987, granting summary judgment to C & P. Upon remand the trial court shall determine whether the PSC approved the tariff as amended by the changes proposed by C & P in 1967, and whether the nature of those tariff changes precluded approval by letter of acceptance and required prior notice and hearing; if the court finds that the tariff was not lawfully approved, then it shall proceed to trial on PASI's claims for negligence, gross negligence and false misrepresentation.

I.

*The facts.*[3] In connection with preparing for the opening of its business providing answering telephone service through a switchboard for professionals, PASI entered into a contract with C & P on Novem-

---

utility, may prescribe a less time within which a reduction may be made.

2. D.C.Code § 43–601 (1981) provides in relevant part:

(c) Any public utility desiring to advance or discontinue any such rate or rates may make application to the Commission in writing, stating the advance in or discontinuance of the rate or rates desired, giving the reasons for such advance or discontinuance.

(d) Upon receiving such application the Commission shall fix a time and place for a hearing, and give such notice to interested parties as shall be proper and reasonable; if, after such hearing and investigation, the Commission shall find that the change or discontinuance applied for is reasonable, fair and just, it shall grant the application, either in whole or in part.

3. *See McCoy v. Quadrangle Dev. Corp.*, 470 A.2d 1256, 1258 & n. 3, 1259 (D.C.1983) (party opposing summary judgment entitled to benefit of all favorable inferences from record evidence including pleadings, depositions, and affidavits); *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); Super.Ct.Civ.R. 56(c). PASI filed a sworn complaint and the president of PASI filed a supporting affidavit with its opposition to C & P's motion for partial summary judgment. *See* Super.Ct.Civ.R. 12–I(k) and R. 56(e).

ber 4, 1975.[4] C & P represented that it could provide the telephone equipment necessary for the operation of PASI's business and install it so that PASI would be able to commence business on February 6, 1987.

C & P began its installation process in late November 1975. In early January 1976, it began installation of its Model 557B answering switchboards, the same model PASI had used from 1952 to 1966 in a prior business venture. PASI objected to the installation of this model because the model had previously proved to be obsolete, unreliable, and difficult to service. C & P acknowledged that the model was obsolete but advised PASI that this was the only model available if PASI wanted to commence business on February 6th, and made a take it or leave it offer, representing that C & P would maintain and service the equipment to provide adequate service. PASI accepted Model 557B on this basis.

Unfortunately, PASI's concerns about Model 557B proved to be well founded. Even before PASI took its first call, C & P's performance was inadequate. By February 6th, C & P had installed only two of the four switchboards that C & P was to provide, and the switchboards that were installed had inadequate cords. During transmission, there was static and deficient volume. Service personnel advised they were not trained to service Model 557B and their attempts were to no avail, and PASI lost all sound after four days. Sound was restored but the crackling static and deficient volume remained. In addition, severe echoes known as "repeater howls" would occur during transmission.

After a number of attempts at repair by personnel not trained to service Model 557B, C & P installed amplifiers to cure the deficient volume; however, this resulted in further problems. The sound continued to be either inaudible or overamplified, which made the voices too loud, created a sound of voices being distant and artificial, and picked up and transmitted other noises.

PASI also suffered a lack of service for substantial periods of time. From the beginning individual subscriber lines would suddenly not work and transmit no sound and restoration of service was delayed from several days to several months. PASI also experienced several instances of telephone lines being disconnected. In November 1978, C & P came onto PASI's premises without notice and removed cable which caused PASI to be without service for several days.[5]

C & P further misrepresented to third parties what service PASI offered when it disconnected a subscriber service and told the subscriber that PASI had ordered the discontinuance, and when it told callers that PASI's main number was not working. PASI maintained that the service provided was unprofessional and disrespectful in manner.

After years of unsuccessful efforts to obtain adequate and reliable service, during which time PASI met repeatedly with C & P officials who represented that they would resolve the problems, PASI filed suit against C & P on February 3, 1983.

*The proceedings in the trial court.* PASI's complaint sought damages from C & P in the amount of $2.2 million dollars for breach of contract, negligence, gross negligence and fraudulent misrepresentation, and injunctive relief and costs. C & P answered and subsequently filed a counterclaim seeking damages in the amount of PASI's outstanding telephone bill.

On November 20, 1984, C & P filed a motion for partial summary judgment on the grounds that PASI's damages were limited by Section 1.E.1 of PSC General Regulations Tariff No. 201 (April 10, 1973) (tariff or exculpatory tariff), which was incorporated by reference in the application

4.  PASI signed an application for service by C & P on February 5, 1976, and deposited $130.00. C & P accepted the application the following day. At that time C & P was part of American Telephone & Telegraph telecommunications and, thus, PASI was unable to contract with any other provider of answering service equipment.

5.  PASI also has had to wait from several days to several months in order for C & P to install connections necessary to provide service to new customers.

for service filed by PASI on February 6, 1975.[6] PASI filed an opposition and a cross motion for summary judgment challenging the validity of the damages limitation on the ground that the tariff had not been lawfully approved. The motions judge granted C & P's motion for partial summary judgment on February 24, 1986. However, upon reconsideration, pursuant to PASI's motion of April 11, 1986, the motions judge, on September 9, 1986, vacated his order granting C & P partial summary judgment on the grounds that there were facts in dispute as to whether the tariff had been filed and lawfully approved.[7]

Thereafter, on May 4, 1987, following discovery, the trial judge (Judge Wolf) granted C & P's motion for summary judgment on the ground that the tariff had been lawfully approved by the PSC. The trial judge relied on C & P's copy of the approval letter of April 10, 1973, from the executive secretary of the PSC, and deposition testimony, including testimony by a C & P employee that he remembered delivering the 1973 filing material to the PSC ten years ago, and on the fact that the absence of additional evidence was explained by the PSC's destructions of its files. The trial judge rejected PASI's contention that the validity of the tariff depended on PSC compliance with the publication requirements of the D.C. Administrative Procedure Act, D.C.Code § 1–1506(a) (1987 Repl.). The

judge also found, on July 8, 1987, that the motions judge had determined that the tariff, if valid, precludes all of PASI's claims except for the proportionate customer charges, and thus, under the law of the case doctrine, that PASI's claim for gross negligence was barred. Alternatively, the judge held the claim was indistinguishable from PASI's fraudulent misrepresentation claim. See note 7, *supra.* Finding that no other issues remained for trial, the trial judge entered judgment for PASI on July 8, 1987, in the amount of $57,163.53, which the parties stipulated was the amount of PASI's unpaid telephone bills.[8]

## II.

PASI contends that the exculpatory tariff was not validly approved and even if it was summary judgment was inappropriate since C & P failed to demonstrate that the PSC had substantively approved the tariff or accepted it for filing. PASI also contends summary judgment was inappropriate because of the alleged destruction of the PSC files. Further, PASI contends that it was error to hold that a validly enacted tariff was enforceable in its case and if enforceable, it did not preclude PASI's claim for gross negligence. Finally, PASI contends the court erred in ruling the false misrepresentation claim was barred by the statute of limitations and in denying the motion to file a second amended complaint.

---

**6.** Section 1.E.1 of PSC General Regulations Tariff No. 201 (April 10, 1973) provides:

The liability of the Telephone Company for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission, or failures or defects in facilities furnished by the Telephone Company, occurring in the course of furnishing service or other facilities and not caused by the negligence of the customer, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the service or facilities affected during the period such mistake, omission, interruption, delay, error or defect in transmission, or failure or defect in facilities continues after notice and demand to the Telephone Company.

The February 6, 1975, application for service stated:

The Applicant understands that, upon the acceptance of this application by the Telephone

Company, all the applicable provisions in the Telephone Company's tariffs lawfully on file become the contract between the Applicant and the Telephone Company. The Telephone Company's tariffs, and consequently the terms of the contract between Applicant and the Telephone Company, are subject to change in the manner prescribed by law....

**7.** C & P also filed, on November 20, 1984, a motion for summary judgment alleging that PASI's claims were barred by the statute of limitations. On February 27, 1986, the motions judge granted C & P's motion as to the fraudulent representation claim. Upon consideration he also affirmed this ruling on September 9, 1986.

**8.** The trial judge dismissed C & P's counterclaim for PASI's unpaid balance for services provided by C & P.

C & P maintains that the exculpatory tariff is enforceable to limit damages, pointing out that such tariffs have been in effect for at least 75 years[9] and upheld by the courts in recognition that reasonable rates depend on some limitations of a public utility's potential liability[10] even when gross negligence has been alleged.[11] C & P maintains that such a tariff has long been in effect in the District of Columbia and that the tariff with the identical language to Section 1.E.1 of Tariff, No. 201 dates back to 1967 and continues in effect. It argues that the District of Columbia courts have viewed such tariffs as consistent with sound public policy, deferring to the PSC on the reasonableness of such a limitation.[12]

C & P maintains, further, that the tariff is legally in effect because it was approved in accordance with the letter of acceptance procedure of D.C.Code § 43–527, as, C & P argues, has previously been upheld by this court, citing *C & P Tel. Co. v. PSC*, 378 A.2d 1085, 1090–91 (D.C.1977) (addressing procedure under predecessor statute D.C. Code § 43–327). Therefore, C & P argues, since the tariff at issue involved only a repagination, use of the letter of acceptance procedure was all that was required.

In its amicus brief, the PSC stated that the 1973 repagination did not constitute a substantive approval of the tariff since all that C & P requested in 1973 was moving pages from one place to another, and not substantive approval of new tariff language. The PSC maintained rather that the tariff was substantively approved by it on October 10, 1967.[13] The PSC stated that because the 1967 filing requested changes in existing tariff language, its approval by the letter of acceptance procedure constituted substantive approval of the tariff, and that because the language in the 1973 filing is identical to the language in the 1967 tariff, it is clear the PSC substantively approved the tariff language at issue. It further noted that under D.C.Code § 43–523 (1986), rates from March 4, 1913, remain in effect unless set aside by the PSC, and that the omission of the word "schedule" from § 43–601(c) and (d) indicates that these sections do not apply to changes in rules and regulations.

■ The District of Columbia Public Utilities Act contemplates rate proceedings and filings involving changes to the schedule of rates.[14] For our purposes, in reviewing the grant of summary judgment to determine the reasonableness of the PSC's interpretation of its statute,[15] the deposition testimony of the executive secretary of the PSC in 1973 is instructive, particularly

**9.** *Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 570–71, 41 S.Ct. 584, 586, 65 L.Ed. 1094 (1921).

**10.** *Id.* at 571–72, 41 S.Ct. at 586–87; *Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, 495 F.Supp. 356, 361 (D.S.C.1979); *Waters v. Pacific Tel. Co.*, 12 Cal.3d 1, 6, 523 P.2d 1161, 1164, 114 Cal.Rptr. 753, 756 (1974).

**11.** *Western Union Tel. Co. v. Priester*, 276 U.S. 252, 259–60, 48 S.Ct. 234, 235–36, 72 L.Ed. 555 (1928).

**12.** *Horwitz v. C & P Tel. Co.*, 265 A.2d 772 (D.C.1970); *Bird v. C & P Tel. Co.*, 185 A.2d 917 (D.C.Mun.App.1962); *Travelers Ins. Co. v. SCM Corp.*, 600 F.Supp. 493 (D.D.C.1984).

**13.** As appendices to its brief, the PSC attached copies of C & P's letter of September 25, 1967, requesting approval of the filing and the PSC's letter of approval of October 10, 1967. C & P's September 25, 1967, letter stated that the filing [r]eorganizes the general regulations governing the furnishing of Intrastate Communications Services including some deletions, changes and additions, to improve clarity and ease of understanding through elimination of duplication and improved format.
Appendix A. The letter of the Executive Secretary of the PSC of October 10, 1967, indicated that the PSC accepted for filing C & P's changes, to be effective October 16, 1967. Appendix B.

**14.** *See* D.C.Code §§ 43–523, 43–524, 43–527, 43–601 (1981). In 1984, the statute was amended to require that the public have an opportunity to comment before the PSC can approve any tariff change. *See* D.C.Code § 43–609 (1986 Repl.). *See also id.* § 43–608.

**15.** The ultimate responsibility for determining the correct meaning of a statute is the duty of this court but we accord substantial deference to any reasonable interpretation of the Public Utilities Act by the PSC which is charged with the Act's administration and enforcement. *C & P Tel. Co. v. PSC, supra*, 378 A.2d at 1089; *Watergate Improvement Assocs. v. PSC*, 326 A.2d 778, 785 (D.C.1974).

since it is consistent with this court's view of the requirements of the statutory regime, *Bird v. C & P Tel. Co., supra* note 12, 185 A.2d at 918, and the PSC procedure at the time, previously described by this court in *C & P Tel. Co. v. PSC, supra,* 378 A.2d at 1090–91. Donald Crotsley, an accountant for the PSC for 26 years and its executive secretary from 1971 until he retired in 1975, testified that there were two procedures by which the PSC approved tariffs.[16] Which procedure was used depended on whether the tariff was major or minor, the latter not affecting rate payers generally but only a few people. For the former, which would be given a formal case number, a public hearing would be held prior to approval of the tariff by the PSC, and could involve a lengthy proceeding. Regarding a filing like C & P's in 1973, Mr. Crotsley testified that the utility would submit the proposal along with supporting materials to him and he would determine, in consultation with the PSC staff, whether the proposal was major or minor.[17] If determined to be minor, the executive secretary would prepare a memorandum of recommendation for the commissioners following staff review.[18] Although he could not specifically recall the 1973 filing, he testified that it would have been handled in accordance with the latter procedure, with the commissioners individually indicating their approval by initialling the tariff. That would be followed by a letter to the utility from the executive secretary advising of the PSC's approval.

Other evidence before the trial judge included C & P's file on the 1973 filing and depositions from two C & P employees who explained that the 1973 filing was part of a multi-year C & P program to modernize its tariffs. C & P's letter requesting approval of the 1973 repagination and its copy of the PSC's approval, as evidenced by a letter April 10, 1973, from the executive secretary, who identified his signature on the letter, also were in evidence.[19]

A. Requirements of the statutory scheme. In *Bird v. C & P Tel. Co., supra* note 12, 185 A.2d 917, the court upheld the validity of an exculpatory clause limiting C & P's liability for negligence, in omitting a name and number from the white pages, notwithstanding that it had not been approved pursuant to the ratemaking procedures. The court noted that C & P was then operating under a basic rate schedule approved by the PSC. It held that the notice, hearing and investigation required by D.C.Code § 43–401 (1961) (predecessor of § 43–601 (1981)) applies "only to the fixing or changing [of] the basic rate to be charged by the utility, and that those requirements are not binding on the [PSC] when called upon to approve a proposed rule or regulation which only indirectly and to a minor degree affects the financial operation of the utility." *Id.* at 918 (footnote

---

16. *See* "Filing Requirements for Rate Changes,", 15 DCMR § 200.1 *et seq.* (Feb.1987), as amended 34 D.C. Reg. 1155 (Feb. 13, 1987). A tariff affecting an existing rate could be filed as part of a rate change application. *See, e.g.* Formal Case No. 827, Order No. 8300, D.C.P.S.C. 325, 390 (1985) (fifty percent of antitrust litigation expenses permitted to be recovered by C & P).

17. In his deposition Mr. Crotsley did not appear to confine "major" tariffs to those involving tariffs for new services. In its brief C & P maintains that "Section 43–601 is applicable to changes in an existing rate, including tariffs for new services." (citing *C & P Tel. Co. v. PSC, supra,* 378 A.2d 1085).

18. PSC staff review involved review by an engineer, accountant, and legal staff.

19. Although Mr. Crotsley testified that he thought the PSC's records were shipped to the Cameron Station Storage Facility, his successor as PSC executive secretary filed an affidavit stating that all of the PSC records for that period had been destroyed pursuant to a new policy adopted in 1980, and that no reference to the 1973 filing would be found in the D.C. Register. Mr. Crotsley testified that he did not think (although he could not remember) a filing in the nature of the 1973 filing would have resulted in a PSC order that would have been published in the D.C. Register, although he thought his letter notifying of PSC acceptance for filing of a minor tariff revision would be published in the Register; the original tariff, which the 1973 filing was amending, would be published. His successor advised by affidavit that the PSC had changed its procedures regarding approval of routine filings of tariff changes to give public notice in the D.C. Register and to issue a formal order of approval. See § 742 of the District of Columbia Self–Government and Governmental Reorganization Act, 87 Stat. 774 (1973).

citations omitted). Thereafter, *C & P Tel. Co. v. PSC, supra*, 378 A.2d at 1090–91, described letter-of-acceptance procedure which the C & P and the PSC contend is sufficient for approval of the tariff here. That procedure is fully consistent with the distinction drawn in *Bird* and the interpretation of the statute by the PSC.

The rate making procedure includes a public hearing process at which the financial operation of the utility is examined.[20] Rates are set based on the factor of an exculpatory tariff limiting the utility's exposure to damages.[21] Accordingly, we find reasonable the PSC's interpretation allowing a less comprehensive procedure, under § 43–527, for tariffs which do not result in a major impact on that financial operation. PASI's argument that § 43–601 procedures are required for all changes to the tariff is flawed because it ignores the reality that the PSC, in examining the utility's financial operation during a rate making proceeding, necessarily considers the impact of the tariff.

PASI does not suggest that C & P was not operating under a rate schedule approved by the PSC after notice and hear-

ing when it contracted with PASI. Thus, changes in the particulars of the tariff as are suggested by C & P may fall within the scope of *Bird's* distinction between rate making and matters indirectly affecting, or only having a minor effect on, the financial operation of C & P. Clearly, § 43–527 procedure was all that was required for the 1973 repagination. Whether it also is all that was required for the 1967 changes is less clear from this record. Since an exculpatory tariff limiting C & P's liability has been in existence for many years, it may well be the PASI has mischaracterized the nature of the tariff on which C & P relies as involving a rate, *Bird v. C & P Tel. Co.*, *supra* note 12, 185 A.2d at 918. The language of the 1967 tariff changes is not before us, however; nor is there any way to determine from the record whether those changes would have more than a minor impact or directly affect the basic rate.[22]

B. Approval of the tariff. There was sufficient evidence before the trial judge, through C & P's files and deposition testimony, that the PSC had approved the 1973 repagination.[23] C & P maintains that

---

20. *See People's Counsel v. PSC,* 399 A.2d 43, 46 (D.C.1979) (citing I PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 45 (1969)).

21. *See Travelers Ins. Co. v. SCM Corp., supra* note 12, 600 F.Supp. at 496 (decision to limit liability is "an inherent part of the rate") (quoting *Western Union Tel. Co. v. Esteve Bros. & Co., supra* note 9, 256 U.S. at 571, 41 S.Ct. at 586). *See id.* at 495–97 ("obviously policy choice to shield C & P from damage claims in exchange for the benefit of lower rates"). *See* D.C.Code § 43–611 (1986). In its brief, the PSC stated that "the exculpatory clause is considered implicitly during a rate case when the rates for services are being considered." And further, that it "determines C & P's total cost of service first, and then during rate design, the [PSC] sets the rates for various services to recover those costs." And still further, that "this procedure clearly demonstrates that costs associated with liability awards against C & P would affect rates." The PSC explains that "the [exculpatory] clause is implicitly recognized in setting rates due to the fact that the [PSC] must permit C & P to recover those costs which have been determined to be reasonable during a rate case proceeding."

22. If the tariff was substantively approved under the letter-of-acceptance procedure by the

PSC in 1967 and the changes proposed by C & P did not have a major impact on its financial operations, then the tariff is valid. If, on the other hand, the 1967 changes did have a major impact on C & P's financial operations that was not considered at the time that the rate schedule in effect was approved, then the tariff would be valid only if approved by the PSC after public notice and hearing. These determinations are to be resolved initially by the trial court.

23. PASI's assertion that the loss of PSC files precludes the entry of summary judgment for C & P because C & P was in a position to have prevented the PSC from destroying its records is without evidentiary foundation. Hence, its reliance on a negative inference from the absence of such evidence is misplaced. The cases on which it relies are not to the contrary. *See Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 217–19 (1st Cir.1982); *Rogers v. Exxon Research & Eng'g Co.,* 550 F.2d 834, 843 (3d Cir.1977). Indeed, under the circumstances, in view of the probative evidence before the trial court, a presumption of legal regularity arises. *Schiffmann v. District of Columbia Alcoholic Beverage Control Bd.,* 302 A.2d 235, 238 (D.C.1973) (citations omitted). *See Derrickson v. Derrickson,* 541 A.2d 149, 151 n. 4 (D.C.1988) (rebuttable presumption); *Legille v. Dann,* 178

the 1973 repagination language at issue is identical to that found in the tariff after C & P proposed changes in 1967, and that approval of the 1973 repagination constituted substantive approval of the tariff. The evidence before the trial judge was that the 1973 filing was part of a multiyear effort by C & P to modernize its tariffs, moving pages around. Thus, the evidence before the trial judge was fully consistent with the PSC's position, contrary to C & P's position, that the 1973 approval of moving pages around did not constitute substantive approval of the tariff, while the PSC's letter indicating its approval of the changes in tariff language requested in C & P's letter in 1967 constituted substantive approval of the tariff. Had there been evidence before the trial court regarding the 1967 tariff changes comparable to that relating to the 1973 repagination, then we might well find no error.[24] In the absence of such evidence, however, summary judgment was inappropriate.[25]

Accordingly, we hold that the motions judge erred in ruling that the tariff, regardless, in effect, of its impact on the financial operation of C & P, was valid if approved by letter of acceptance, and the trial judge erred in finding that the PSC had approved the tariff based on the evidence of its approval of the 1973 repagination.

### III.

As to PASI's other contentions relating to the tariff, we find no grounds for reversal of the trial court.

■ A. Gross negligence. PASI appeals from the trial judge's July 8, 1987, order granting summary judgment to C & P on the gross negligence claim on the grounds of the law of the case doctrine or, alternatively, that it was indistinguishable from PASI's fraudulent misrepresentation claim.

PASI contends that reliance on the law of the case doctrine was misplaced since the motions judge had not previously ruled on the gross negligence claims. *Kaplan v. Pointer*, 501 A.2d 1269, 1270 (D.C.1985); *Kritsidimas v. Sheskin*, 411 A.2d 370, 372–73 (D.C.1980). C & P responds that the motions judge had twice had the issue squarely presented to him and ruled against PASI on the gross negligence claim first, in his order of February 24, 1986, granting summary judgment, and second in his order of September 9, 1986, following the granting of PASI's motion for reconsideration. We agree that the motions judge ruled that C & P's liability was limited by the tariff, and, therefore, the trial judge did not err in concluding that the motion judge had rejected PASI's gross negligence claim.[26] The question remains whether the motions judge erred in ruling that PASI's gross negligence claim did not survive the tariff.

This court has not expressly reached the issue of whether the exculpatory tariff shields C & P against claims of gross negligence or intentional misconduct. *See Horwitz v. C & P Tel. Co.*, *supra* note 12, 265 A.2d at 773. In its brief the PSC has urged

---

U.S.App.D.C. 78, 81, 544 F.2d 1, 4–5 (1976) (same).

**24.** PASI's suggestion in its supplemental brief that the 1967 tariff changes could not have been substantively approved by the PSC within the ten day period of the letter of acceptance procedure is fully answered in Mr. Crotsley's deposition describing how C & P officials worked with PSC staff in advance of formal submission of a request for PSC approval of tariff changes.

**25.** *Lamphier v. Washington Hosp. Center*, 524 A.2d 729, 731–32 (D.C.1987) (summary judgment is an extreme remedy); *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 62 (D.C.1983) (same). *See Wemhoff v. Investors Management Corp.*, 455 A.2d 897, 899 (D.C.1983). *See Burch*

*v. Amsterdam Corp.*, 366 A.2d 1079, 1083–84 (D.C.1976) (review to determine if issue of material fact or substantive law properly applied).

**26.** This is not to say, however, that it necessarily follows that the trial judge properly applied the law of the case doctrine. *See Morse v. Morse*, 213 A.2d 581, 583 (D.C.1965) (law of case doctrine is a rule of practice and should not be applied where prior decision was plainly wrong and would result in manifest injustice); *see Naples v. United States*, 123 U.S.App.D.C. 292, 293 n. 1, 359 F.2d 276, 277 n. 1 (1966) (quoting 1B Moore Federal Practice ¶ 0.404[1], at 405 (2d ed.1965)).

that this court should not find an exception for gross negligence claims in recognition of the "obvious policy to shield C & P from damage claims in exchange for the benefit of lower rates," quoting *Travelers Ins. Co. v. SCM Corp.*, *supra* note 12, 600 F.Supp. at 497. It argues, further, that this would be consistent with the tariff language which is "absolute." However, the PSC also has taken the position in its brief that "whether intentional conduct *or gross negligence on the part of C & P could result in* an award of damages greater than the remedy provided in the tariff" is a "determination [that] lies with the courts." [27]

The language of the tariff on which C & P relies is fairly sweeping, providing that its liability "shall in no event" exceed the proportionate customer charge, and reflecting an "obvious policy choice" of the kind that this court has recognized is best left to the PSC. *See Bird v. C & P Tel. Co.*, *supra* note 12, 185 A.2d at 919. The rationale underlying such tariffs that is recognized in other jurisdictions stems from the fact that so much of the modern telephone system involves mechanical devices in which the human element has been largely eliminated. *See Wilkinson v. New England Tel. & Tel. Co.*, 327 Mass. 132, 135, 97 N.E.2d 413, 416 (1967); *Burdick v. Southwestern Bell Tel. Co.*, *supra note 27*, 9 Kan.App.2d at 186, 675 P.2d at 926 (citing *Wilkinson, supra*). Exceptions could logically follow for gross negligence,[28] and have been adopted by the utility commission or legislature in some jurisdictions. Thus, courts in jurisdictions which have addressed the issue, albeit where the language of the tariff is different, have held that an exculpatory tariff may not be raised as a defense to gross negligence or intentional conduct as a matter of public policy unless the tariff is specific.[29] In cases in which the tariff language has been as broad as the tariff on which C & P relies, however, the courts have generally held that the tariff limitation represents

**27.** *See, e.g., Burdick v. Southwestern Bell Tel. Co.*, 9 Kan.App.2d 182, 186, 675 P.2d 922, 926 (1984) (court is final arbiter of reasonableness of a limitation of liability) (citing *Holman v. Southwestern Bell Tel. Co.*, 358 F.Supp. 727, 729 (D.Kan.1973)). See note 15, *supra*.

**28.** *See Burdick v. Southwestern Bell Tel. Co.*, *supra* note 27, 9 Kan.App.2d at 185, 675 P.2d at 925 (willful conduct is "'action indicating a design, purpose or intent on the part of a person to do wrong or to cause an injury to another'") (quoting *Anderson v. White*, 210 Kan. 18, 19, 499 P.2d 1056, 1058 (1972)). *See generally Copeland v. Baltimore & Ohio R.R. Co.*, 416 A.2d 1, 3 (D.C.1980) (citing Prosser, Law of Torts, § 58, at 369–70 (3d ed.1964)); *Safeway Trails, Inc. v. Schmidt*, 225 A.2d 317, 320 (D.C.1967) (approving jury instruction defining "wanton" as extreme recklessness and utter disregard for the rights of others.)

**29.** *See, e.g., Wilkinson v. New England Tel. & Tel. Co.*, *supra*, 327 Mass. at 135, 97 N.E.2d at 416; *Sommer v. Mountain States Tel. & Tel. Co.*, 21 Ariz.App. 385, 388, 519 P.2d 874, 877 (1974) (tariff inapplicable to willful and deliberate act); *Devers v. Long Island Lighting Co.*, 79 Misc.2d 165, 166, 359 N.Y.S.2d 940, 941 (N.Y.Sup.Ct.App. Term 1974); *Newman v. Consolidated Edison Co. of New York, Inc.*, 79 Misc.2d 153, 154, 360 N.Y.S.2d 141, 142 (N.Y.Sup.Ct.App.Term 1973); *Lee v. Consolidated Edison Co. of New York, Inc.*, 98 Misc.2d 304, 305, 413 N.Y.S.2d 826, 827 (N.Y.Sup.Ct.App.Term 1978); *Southwestern Bell Tel. Co., Inc. v. Rucker*, 537 S.W.2d 326, 332 (Tex.Civ.App.1976) (no evidence of gross negligence where tariff limited liability for failure to maintain proper standards of maintenance and operation and to exercise reasonable supervision); *Southern Bell Tel. & Tel. Co. v. Invenchek, Inc.*, 130 Ga.App. 798, 800, 204 S.E.2d 457, 460 (1974) (same); *Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, *supra* note 10, 495 F.Supp. at 364 (insufficient allegations; summary judgment); *Holman v. Southwestern Bell Tel. Co.*, *supra* note 27, 358 F.Supp. at 730 (same).

In the New York cases, the tariff provides that there shall be "no liability ... in the absence of gross negligence or willful misconduct." *See, e.g., Held v. New York Tel. Co.*, 73 Misc.2d 582, 583, 342 N.Y.S.2d 665, 666 (N.Y.Civ.Ct.1973). *See also Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, *supra* note 10, 495 F.Supp. at 362; *Holman v. Southwestern Bell Tel. Co.*, *supra* note 27, 358 F.Supp. at 730.

California has a statute allowing the award of exemplary damages against a utility for gross negligence, but the amount of damage has been limited. *See Waters v. Pacific Tel Co.*, 12 Cal.3d 1, 4, 523 P.2d 1161, 1162 n. 2, 114 Cal.Rptr. 753, 754 n. 2 (1974) (in suit for ordinary negligence, held statute limited to circumstance that would not frustrate utility commission's statutory authority); *Stern v. General Tel. Co. of California*, 50 Cal.App.3d 538, 542, 123 Cal.Rptr. 373, 375 (1975) (tariff formerly a shield to claims for gross negligence revised to limit liability for gross negligence to $10,000, allowing some recovery as incentive for reducing errors).

the entire liability of the utility.[30] These decisions follow the analysis in *Western Union Tel. Co. v. Esteve Bros. & Co.*, *supra* note 9, 256 U.S. at 572, 41 S.Ct. at 586, that the "rate represent[s] the whole duty and the whole liability of the company," and *Western Union Tel. Co. v. Priester*, *supra* note 11, 276 U.S. at 259–60, 48 S.Ct. at 235–36, that regulatory statutes, overriding the common law, were enacted to assure "reasonable and just rates for all without undue preference or advantage to any," and that it was beyond the authority of the courts, in the face of a lawful exercise of regulatory power making no distinction between degrees of negligence, to annex, upon any theory of public policy, conditions affecting the uniformity and equality of the rates even for gross negligence. "Such being the basis of liability, we do not perceive any adequate ground upon which it may be enlarged merely by the application of a 'vituperative epithet' to the admitted fault of the petitioner." *Western Union Tel. Co. v. Priester*, *supra* note 11, 276 U.S. at 259–60, 48 S.Ct. at 235–36 (citation omitted). Although the uniformity underlying the Western Union Telegraph Company involves nationwide uniformity, *see* *Sims v. Western Union Tel. Co.*, 37 Misc.2d 943, 946, 236 N.Y.S.2d 192, 195 (N.Y.Sup.Ct.1963) (citing *Western Union Tel. Co. v. Esteve Bros. & Co.*, *supra* note 9, 256 U.S. 566, 41 S.Ct. at 584), the nature of the rate and the role of the utility commission under state law is analogous to that under the Interstate Commerce Act. *See McTighe v. New England Tel. & Tel. Co.*, 216 F.2d 26, 29 (2d Cir.1954) (applying Vermont law). Certainly it is consistent with the analysis of the nature of the rate and the role of the PSC by courts in this jurisdiction. See note 21, *supra*. Accordingly, we hold that the tariff, if lawfully approved by the PSC, would provide a shield against PASI's gross negligence claim.

Viewing the allegations in PASI's complaint as true,[31] moreover, all except one would not prove gross negligence. Repeated instances of negligence are insufficient.[32] *See Olson v. Mountain States Tel. & Tel. Co.*, 119 Ariz. 321, 323, 580 P.2d 782, 784 (1978). *See also Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, *supra*, note 10, 495 F.Supp. at 362–64 (cases cited); *Holman v. Southwestern Bell Tel. Co.*, *supra* note 27, 358 F.Supp. 730; *Wilkinson v. New England Tel. & Tel. Co.*, *supra*, 327 Mass. at 133, 97 N.E.2d at 415; *Valentine v. Michigan Bell Tel. Co.*, 388 Mich. 19, 29, 199 N.W.2d 182, 187 (1972). Only PASI's contention that some actions of C & P were racially motivated would, if proved, establish willful and wanton misconduct.[33] *See*

---

30. *See, e.g., Trammell v. Western Union Tel. Co.*, 57 Cal.App.3d 538, 554–55, 129 Cal.Rptr. 361, 370–71 (1976); *Komatz Constr. Inc. v. Western Union*, 290 Minn. 129, 138, 186 N.W.2d 691, 697, *cert. denied*, 404 U.S. 856, 92 S.Ct. 102, 30 L.Ed.2d 98 (1971). In two cases in which the tariffs included broad language like that in the instant case, the courts held that the tariff did not limit liability for gross negligence. *Wheeler Stuckey, Inc. v. Southwestern Bell Tel. Co.*, 279 F.Supp. 712, 714 (W.D.Okla.1967); *Warner v. Southwestern Bell Tel. Co.*, 428 S.W.2d 596, 600, 603 (Mo.1968). However, both decisions rely on cases from other jurisdictions permitting recovery for gross negligence without addressing the different language in those tariffs, *Wheeler Stuckey, supra*, 279 F.Supp. 714–15 and *Warner, supra*, 428 S.W.2d at 603, and neither decision cited *Western Union Tel. Co. v. Priester, supra* note 11, 276 U.S. at 259–60, 48 S.Ct. at 235–36 (liability limitation not distinguishing between degrees of negligence represents whole liability of the company) or discussed its analysis.

31. See note 3, *supra*.

32. Attached to C & P's statement of facts not in dispute was the final appeal report of the PSC, relating to PASI's complaint about service problems since 1976, in which it is stated that "Massive attempts to improve service have been undertaken but have fallen short of satisfying the customer." The report also stated that "Transmission improvement on interoffice facilities must occur for proper service levels to suit the needs of this customer." *See Horwitz v. C & P Tel. Co., supra* note 12, 265 A.2d at 773 (wanton recklessness or intentional wrongdoing required to show more than mere negligence).

33. PASI generally alleged in its complaint that C & P's "wanton and willful conduct in refusing and/or failing to promptly rectify the inoperativeness of PASI equipment is gross negligence." In particular, PASI alleged that C & P's "wrongful failure to perform as obligated under [their] agreement" involved, *inter alia*, "[d]egenerating and derogatory references to the president of the plaintiff corporation as a 'black kook.'" C & P's statement of material facts as to which there is no genuine issue attached a letter sent

*Tolliver v. Amici*, 800 F.2d 149, 151 (7th Cir.1986) (racial slur constitutes evidence of willful or wanton conduct to support award of punitive damages); *Bohannon v. Pegelow*, 652 F.2d 729, 731–33 (7th Cir.1981) (opinion testimony that defendant was motivated by racial prejudice admissible to establish wanton and malicious conduct). *See generally Glekas v. Boss & Phelps, Inc.*, 437 A.2d 584 (D.C.1981) (summary judgment inappropriate where motive or intent a material issue). This was, however, hardly the gravamen of PASI's complaint about C & P.[34]

■ B. Enforceability. In *Bird v. C & P Tel. Co., supra* note 12, 185 A.2d at 919, the court rejected a claim that a limitation of liability was invalid because it was unreasonable, holding that such a determination is "primarily a matter for determination by the [PSC]" and noting that the reasonableness of such a limitation has generally been upheld. *Id.* at 919 n. 3 (citations omitted). Consequently, PASI's contentions that the tariff is unenforceable because unconscionable and against public policy fail.[35] Similarly, since the tariff language of the 1973 filing is broader than the tariff in *Horwitz v. C & P Tel. Co., supra* note 12, 265 A.2d 772, which was limited to interruptions in service, PASI's reliance on that case for its contention that its claim for negligent installation of equipment and facilities is not barred also fails.[36]

■ C. Fraudulent misrepresentation. The motions judge granted summary judgment to C & P on PASI's claim for fraudulent misrepresentation on the ground that it was barred by the three-year statute of limitations, D.C.Code § 12–301(8) (1981), which started to run in 1976 when C & P furnished the obsolete equipment. The judge stated that "the only allegation of 'fraudulent misrepresentation' contained in the plaintiff's complaint refers to the allegedly obsolete nature of the equipment Appellee agreed to furnish."

PASI's claim is not based on the furnishing of obsolete equipment, a fact of which PASI was clearly aware at the time it entered the contract, but on C & P's alleged misrepresentations that it could nonetheless provide adequate service through proper maintenance and repair. The com-

by PASI's attorney to C & P stating that these remarks were made by a C & P supervisor of repairs to another C & P employee and asserting that C & P's actions and attitudes are racially motivated. The letter noted, however, that when challenged, the speaker claimed not to be referring to PASI. In its opposition to C & P's motion for partial summary judgment, PASI's president suggested in an affidavit that the racial comments were directed at PASI's president. *See generally Lynch v. Meridian Hill Studio Apartments, Inc.*, 491 A.2d 515, 521 (D.C. 1985); *Spellman v. American Sec. Bank*, 504 A.2d 1119, 1123 (D.C.1986). *See Horwitz v. C & P Tel. Co., supra* note 12, 265 A.2d at 773 (wanton recklessness or intentional wrongdoing required to show more than mere negligence).

34. The trial judge did err in ruling that PASI's gross negligence claim was indistinguishable from its fraudulent misrepresentation claim. The two claims do not contain identical elements of proof, *compare District of Columbia v. Fowler*, 497 A.2d 456, 462 n. 13 (D.C.1985) (negligence); *Copeland v. Baltimore & Ohio R.R. Co., supra* note 28, 416 A.2d at 3 (gross negligence) with *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706 (D.C.1981) (fraudulent misrepresentation), and the facts necessary to support the claims and the analysis to resolve the claims will be different.

35. PASI's unenforceability argument rests on its claims that (1) C & P cannot claim the benefit of contractual provisions with respect to PASI's claims relating to repair and maintenance, citing cases which we find inapposite since they do not involve a regulated utility, *see e.g., Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp.*, 360 U.S. 411, 416–18, 79 S.Ct. 1210, 1214–15, 3 L.Ed.2d 1334 (1959); *Waters, supra* note 29, 12 Cal.3d at 6, n. 5, 9, 523 P.2d at 1164 n. 5, 1166, 114 Cal.Rptr. at 756 n. 5, 758; *See Travelers Ins. Co. v. SCM Corp., supra* note 12, 600 F.Supp. at 496 ("the tariff is not merely a private limitation on liability between the bargaining parties but a binding public regulation—established as a matter of public policy—to limit the liability of C & P"); (2) such a tariff is unconscionable, a claim inconsistent with *Bird v. C & P Tel. Co., supra* note 12, 185 A.2d at 919, and *Western Union Tel. Co. v. Esteve Bros. & Co., supra* note 9, 256 U.S. at 571–573, 41 S.Ct. at 586–587; and (3) the tariff is against public policy and therefore void, a claim we view as also having been rejected in *Bird*.

36. PASI's further contention that the tariff is unenforceable because the 1973 repagination was not published in the D.C. Register is meritless. See note 19, *supra*. *See* D.C.Code § 1–1506 (1973) & (1981).

plaint specifically referred to the misrepresentation that C & P had "the ability to provide parts and servicing to [PASI]." [37] Consequently there was no basis for the motions judge to find that PASI should have known on the date that the contract was formed and the equipment was furnished that C & P had fraudulently misrepresented that it would adequately service the equipment. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1126 (D.C.1987) (statute of limitations for fraud begins to run upon discovery of facts from which claim arises, or at the time such facts should reasonably be ascertained); *Bailey v. Greenberg*, 516 A.2d 934, 941 (D.C.1986); *Doolin v. Environmental Power Ltd.*, 360 A.2d 493, 497 (D.C.1976). *See also Fishman v. Estrin*, 501 F.Supp. 208, 211 (D.D.C.1980) ("a reasonable person has every right to believe that persons of 'high integrity' will carry out their contracts.") In addition, PASI alleged that C & P's conduct was continuous and that C & P made subsequent representations to PASI that it would correct the deficiencies in services. If proved at trial these facts would estop C & P from asserting the statute of limitations, *Fontana v. Aetna Casualty & Sur. Co.*, 124 U.S.App.D.C. 168, 171, 363 F.2d 297, 299–300 (1966), or constitute a continuing tort. *Cf. L'Enfant Plaza East, Inc. v. John McShain, Inc.*, 359 A.2d 5, 7 (D.C.1976).[38] If the tariff was lawfully approved by the PSC, however, it would limit PASI's recovery of damages.

Accordingly, we reverse and remand the case for further proceedings.

*Reversed and remanded.*

---

**37.** See also the affidavit of PASI's president attached to PASI's opposition to C & P's motion for partial summary judgment.

**38.** We find no abuse of discretion by the trial judge in denying PASI's motion to file a second amended complaint. *Eagle Wine & Liquor Co.*
*v. Silverberg Elec. Co.*, 402 A.2d 31, 34 (D.C. 1979). As the judge observed, PASI was simply trying to end run the motions judge's grant of summary judgment on PASI's fraudulent misrepresentation claim. *See 1901 Wyoming Ave. Co-op. Ass'n v. Lee*, 301 A.2d 70, 72 (D.C.1973).